# EXHIBIT D



The Massarsky Group at
Citrin Cooperman Advisors LLC

50 Rockefeller Plaza
New York, NY 10020
**T** 212.697.1000 **F** 212.202.5107
citrincooperman.com

# EXPERT REBUTTAL REPORT OF BARRY M. MASSARSKY

---

PRIVILEGED & CONFIDENTIAL – ATTORNEY WORK PRODUCT

United States District Court
Southern District of Florida

Index No. 1:24-cv-23066 (CMA)

Rene Lorente Garcia a/k/a Rene Lorente
Plaintiff

v.

Karolina Giraldo Navarro, et al.

## Expert Rebuttal Report on Damages

Dated: March 17, 2025

# TABLE OF CONTENTS

I.      Introduction ...........................................................................................................1

    A.   Qualifications ...........................................................................................1

II.     Overview ...............................................................................................................3

III.    Streaming Activity Of The Alleged Infringed Song ............................................5

IV.     Star Power Of Karol G And Tiësto .....................................................................6

V.      Mr. Viera Uses Incorrect Streaming And Sales Totals .......................................7

VI.     Adjusting The Royalty Calculations ..................................................................11

VII.    Actual DBS Earnings .........................................................................................13

VIII.   Plaintiff's Expert's Damages Calculations Have No Basis In Reality ..............15

IX.     Summary Of Opinions ........................................................................................23

Appendix A:  Curriculum Vitae of Barry M. Massarsky ................................................24

Appendix B: Documents Considered..............................................................................27

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

## I.   INTRODUCTION

### A.   QUALIFICATIONS

1.   My name is Barry M. Massarsky.  I am a partner and Co-Leader of the Music Economics and Valuation Services Practice at Citrin Cooperman Advisors LLC ("Citrin Cooperman"). In this role, I provide clients with both strategic counsel and statistical data analyses to understand the economic valuation of copyrights in musical compositions ("compositions") and sound recordings ("recordings").  I regularly provide consulting services to many of the most significant copyright owners and industry associations of compositions and recordings including the Recording Industry Association of America, SoundExchange, The National Music Publishing Association (NMPA), BMI, SESAC, Warner Chappell, Universal Music Publishing Group, SONY Music Publishing and a host of smaller independent music publishers and record companies.  My clients own, control, and/or represent most of all the recordings produced and the predominate share of value all compositions owned in the United States.

2.   I joined Citrin Cooperman in January 2022 when Citrin Cooperman acquired Massarsky Consulting, a firm I founded in 1992.  This year, the Blackstone Group placed a significant equity interest in Citrin Cooperman. Prior to founding Massarsky Consulting, I served as Senior Economist at the performance rights organization ASCAP, where I helped lead the survey and distribution strategy for ASCAP's songwriter, composer and music publisher members.  I am often sought out by third party financial investors, professional groups and policy makers about my understanding of the music industry and about new developments in the area of the copyright values of compositions and recordings.  I have spoken on these topics at conferences and in front of private audiences, and have been featured in the media, including *The New York Times*, *Wall Street Journal*, and *The Today Show*.  I have authored "The Operating Dynamics behind ASCAP, BMI and SESAC, The U.S. Performing Rights Societies," which appeared in *Technological Strategies for Protecting Intellectual Property in the Networked Multimedia Environment*, Volume 1, Issue 1, January 1994, pp. 217-225.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

3.  Over the course of my career, I have assisted clients across nearly all areas of the music industry.  A significant part of my work involves estimating the value of portfolios of recordings and compositions.  I have advised nearly all of the major music publishing companies in evaluating royalty streams across all significant music genre classifications. I also have provided similar services for well-known composer catalogs, including Marvin Hamlisch, the Estates of George Gershwin and John Lennon, the Guess Who, Pete Townshend, Lionel Richie, Paul Simon, and Metallica.

4.  I regularly consult with clients over the value of recordings, including the value of newly granted rights in recordings.  Since 2001, I have advised SoundExchange, the performance rights collective that directs royalty payments to artists and recording companies.  These royalties are generated from licensed revenue realized from subscription-based digitally-transmitted audio services, and other digital transmissions conforming to the operating requirements set forth in either the Digital Performance Right in Sound Recordings Act or the Digital Millennium Copyright Act, which are amendments to the U.S. Copyright Act enacted within the last two decades in an effort to address technological changes.  These licensed music services are strictly non-interactive and are served by a compulsory license determined by federal authorities.  This is in contrast to synchronization licensing,  which operates as a free market-based negotiation alternative to compulsory licensing.  I have testified on behalf of the Phonographic Performance Company of Australia, the collecting society that represents the Australian record label industry, in its rate proceeding governing a first-time license fee for digital simulcast or radio transmissions publicly performed in Australia. I presented testimony to the Federal Court of Australia in June 2015. I will reprise that role in 2025.

5.  I hold a B.A. degree from Boston University and an M.B.A. from Cornell University.  A current version of my CV, which lists my prior testimony over the past four years are attached as Appendix A.

6.  Citrin Cooperman is being compensated at my customary hourly rate of $900 per hour. Part of the work in this matter was performed at my direction by Elon Altman, Director whose customary hourly rate is $650.  Payment is not dependent on my opinions expressed or on the outcome of this case.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

## II.    OVERVIEW

7.    I have been engaged by counsel for the Defendants to respond to a portion of the report submitted by Richie Viera (the "Viera Report") in this matter and to proffer my own opinion and analysis regarding the soundness of Mr. Viera's supposed methodology for determining plaintiff's alleged claim for "profits" and damages, assuming that plaintiff prevails on his claim of copyright infringement, relating to United States exploitation of the song "Don't Be Shy" ("DBS"), recorded by Karol G and  Tiësto and co-written by Teemu Brunila, Jonas Kröper and Yoshi Breen (who are all foreign citizens, and have been dismissed from this case as defendants, and have publishing agreements with foreign music publishers, none of whom are defendants in this case).

8.    Rene Lorente Garcia a/k/a Rene Lorente  ("Plaintiff") alleges that DBS infringes his flute instrumental compositions and recording, "Algo Diferente" ("AD").  At the outset, I would note that Mr. Viera's expert report is based on pure speculation and where he purports to rely on information obtained from public sources, such as the RIAA, at best, he clearly does not understand the information he uses. Even worse, as I will discuss in the last section of this rebuttal report addressed to some $42 million of the claim Mr. Viera advances, he has literally plucked his numbers from thin air.  He provides nothing to support a single one of these numbers, which bear no relationship to either the actual revenue of DBS (or to the economic value of AD, which is virtually nil).  Moreover, the $42 million that Mr. Viera advances is repeatedly duplicative and includes tens of millions of dollars of claims, that I am advised by counsel do not exist under the United States Copyright Act.  His report provides no assistance to this Court and violates Rule 26 in multiple respects.[1]

9.    To my knowledge and completely absent from his report, Mr. Viera has apparently never seen, and has no knowledge of, any of the songwriter agreements (which are between the non-defendant songwriters and non-defendant foreign music publishers).  He has never seen, and has no knowledge of, any of the sub publishing agreements between the

---

[1]   This rebuttal report will only note requirements under Rule 26(a)(2)(B), such as a list of all publications authored by the witness within the preceding ten years; the compensation to be paid and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years that Mr. Viera's report lacks.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

originating non-defendant foreign music publishers and the U.S.-based defendant music publishers.  He also has never seen and has no knowledge of the terms of the mechanical license between Atlantic Records (the label that released the recording of DBS) and the publishers.  He assumes what he conceives to be the statutory rate in the United States was the applicable rate for the sale of physical and digital recordings of DBS (which, as discussed below, he massively inflates because he does not understand that RIAA sales certifications include both actual sales and streaming "equivalents") but he has no basis for such assumption.  Particularly where the recording artists are also writers, the statutory rate is rarely applicable as lower so-called "controlled compositions" clauses usually apply.

10.     Thus, Mr. Viera has no knowledge of what the actual mechanical (or other) income has been for DBS.  Instead, he simply engages in pure speculation as to how much it may have been based on RIAA certifications that, as I will explain below, he quite clearly misunderstands.  But that is just the start of the problems with his report.  Mr. Viera also does not know how much of the music publishing revenue that he has speculated exists is required to be and has been remitted to the foreign music publishers, including the share of such revenues that is payable to the foreign songwriters.  He seems to assume it is zero. It is not and those are deductible costs of the US publishers and must be removed from the gross revenues of DBS to arrive at "profits."  As I have said, Mr. Viera's report is riddled with mistakes and unverified data and information.

11.     As a result, the publishing revenue figures (meaning the revenues generated by the composition DBS) that Mr. Viera speculates has been generated in the United States ignores that, under typical songwriter agreements and typical sub publishing agreements with respect to songs written by foreign songwriters and controlled by foreign publishers, the United States sub-publishers commonly are only entitled to retain 10% to 15% of the United States income and are contractually required to remit between 85% to 90% of the income to the originating foreign publisher (which in turn is commonly obligated to remit 75% to 90% to the songwriters).  Thus, even assuming that Mr. Viera had an authenticated basis for assuming what the gross United States music composition earnings were for DBS – and he has no such basis - he has ignored that most of that actual revenue is contractually

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

required to be paid out to the foreign publishers and songwriters, reducing the defendants' share of United States income dramatically.

12.     In addition, Mr. Viera, has ignored the fact that AD is a purely instrumental work, it has no lyrics.  In contrast, DBS has both music and lyrics.  As the lyrics cannot possibly be infringing, at least 50% of the value of DBS's income in the United States has to be deducted (as lyrics are typically accorded a 50% value of a song).  It is not clear from Mr. Viera's report what percentage of DBS he is claiming (it appears to be 100%), but it does not appear that he backs out any elements that are not alleged to be infringing.  But in addition to advancing a claim that seems to assume that 100% of DBS is infringing (which is quite obviously not the case), as discussed below, Mr. Viera is claiming many multiples of DBS's United States gross revenue, ignoring that most of the revenue is paid out to non-defendants overseas, and that the allegedly infringing portions of DBS are only a small fraction of the song - even without taking into account that DBS's lyrics do not infringe anything in AD and the meaningful effect of Karol G and Tiësto's popularity on the DBS's success.  In so doing, Mr. Viera has very significantly, indeed, massively, inflated the supposed United States revenues of DBS, without even considering the $42 million in claims he advances that have no underlying support and are duplicative of each other and of other claims he advances (which I address in Section VII below).

## III.     STREAMING ACTIVITY OF THE ALLEGED INFRINGED SONG

13.     Using Luminate (as noted below, Luminate is the recognized industry source of streaming data) streaming data for the United States, it is clear that "Algo Diferente" did not have any historical significant market impact (on the contrary, its streaming and video view levels are virtually non-existent).  From the first quarter of 2015 (the first period in which AD had U.S. streaming activity) through the second quarter of 2023, Plaintiff's recording of AD averaged 24.79 U.S. streams (audio & video) per quarter. This equates to 1 stream every 3.6 days.  By way of comparison, even moderately successful songs have millions of streams (and successful songs have billions of streams).

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

14.     The announcement of the lawsuit in the media in August 2023 caused streams to spike. AD had 10,212 U.S. streams in the third quarter of 2023, a 411x increase compared to the average historical streams. The spike was short-lived, and by the fourth quarter of 2024 streams had fallen to 924, a -91.0% decrease from the publicity-induced peak.



15.     Not only was AD unsuccessful in streaming, it also generated almost no single sales. From 1Q15 through 4Q24, Luminate data only shows 5 total sales of singles in the United States.

## IV.     STAR POWER OF KAROL G AND TIËSTO

16.     A major factor in DBS's success is the star power of the artists who recorded it, Tiësto and Karol G.

17.     Karol G is one of the world's most popular artists, not just in the Latin genre, but across all genres. In 2024, she was the 15th most streamed artist in the world on Spotify,[2] with more streams than superstars like Kendrick Lamar, Coldplay, Justin Bieber, and Rihanna.

---

[2] Source: https://chartmasters.org/spotify-most-streamed-artists-2024/#:~:text=15%20(7)%20Karol%20G%20%E2%80%93,Colombian%20artists%20and%20%2327%20overall

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

She has been the most viewed artist on Vevo for 4 consecutive years (2021-2024),[3] with 3.57 billion views in 2024, nearly doubling Taylor Swift's total of 1.99 billion.

18.   Since her first top 10 song on the U.S. Latin chart in 2018, "Mi Cama," Karol G has had ten additional top 10 songs before the release of "DBS," including mega-hits like "China," "Tusa," and "Secreto."

19.    Tiësto is one of the most famous DJs in the world, having been voted "The Greatest DJ of All Time" in 2011 by Mixmag readers[4], and the "best DJ of the last 20 years" by DJ Mag readers in 2013.[5]  He is the 106th most streamed artist of all time on Spotify.[6]

20.   I compiled the Luminate U.S. streams from Jan 3, 2014 (the earliest date available) through March 2, 2025 for every song of Karol G's that Luminate includes on its "Singles & EPs" list.. Across that time frame, of the 83 unique Karol G songs that were streamed in the U.S., 80 out of the 83 Karol G songs had over 1 million streams. 70 out of 83 had over 10 million streams. 35 out of 83 had over 100 million streams. DBS was only the 22nd most streamed Karol G song in the United States.

21.   I compiled the same information for Tiësto.  265 songs by Tiësto had at least 1 U.S. stream. 177 out of 265 had over 1 million streams. 58 out of 265 had over 10 million streams. 16 out of 265 had over 100 million streams.

## V.   MR. VIERA USES INCORRECT STREAMING AND SALES TOTALS

22.   Plaintiff's expert has based his calculations on incorrect streaming totals and a complete misunderstanding of sales totals.  Mr. Viera claims that the album "Drive," on which DBS is one of 12 or 13 tracks (there are at least two configurations of "Drive" one that has an additional track), has sold 580,000 albums, based on a website called "bestsellingalbums.org." He also provides the album's corresponding RIAA Gold certification (given to albums that sell over 500,000 units in the United States) as further

---

[3] Source: https://routenote.com/blog/2024-on-vevo/

[4] Source: https://web.archive.org/web/20150225214528/http://www.mtv.com/news/1656432/david-guetta-tiesto/

[5] Source: https://web.archive.org/web/20201117174434/https://djmag.com/content/tiesto-legend

[6] Source: https://chartmasters.org/most-streamed-artists-ever-on-spotify/

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

evidence that the album has sold over 500,000 units. He is wrong.  Since 2016, RIAA certification has been based on what the industry calls "album equivalent units."  It is common knowledge among those versed in the music industry that RIAA certification is based on "album equivalent units" in the streaming era and does not only reflect digital and physical sales.  As a putative expert, I would assume Mr. Viera should know this, but it appears he does not.  Moreover, the RIAA website clearly and unequivocally states how this is calculated: "Album sales, single sales and on-demand audio and/or video streams are calculated at the formula of 1,500 on-demand audio and/or video streams = 10 track sales = 1 album sale."[7] The album "Drive" achieved RIAA Gold certification largely due to converting streams to "album sales" based on the 1,500 streams = 1 album sale ratio.

23.     I used Luminate, the industry standard provider of accurate sales and streaming data, to pull the streaming and sales activity of the album "Drive." From inception through March 2, 2025, the album's total physical and digital sales were 6,886 units in the United States **(or some 573,000 fewer units than Mr. Viera erroneously presumed had been sold).** However, the album's total U.S. on-demand streams (audio & video) is 1,394,731,712. Based on the RIAA's conversion ratio, this equates to 929,821 album sales strictly from streaming.

24.     Thus, the album's RIAA Gold certification is due almost wholly to its streaming activity as the total actual sales, physical and digital, were negligible (less than 7,000 units). Having massively inflated the sales numbers (by a multiple of more than 80x), Mr. Viera (mis)calculates DBS's earnings from the album based on an inflated number that includes album equivalent units, which are not actual sales.  Mr. Viera is not only massively inflating the album sales income but he counts the same "sales" and income twice: once for sales of the album that never happened and a second time for streaming.  The actual earnings of DBS from the album "Drive" would be based on the 6,886 physical and digital units sold (1.1% of the total that Mr. Viera uses), reduced by applicable expenses, and then divided by 12 or 13, since DBS is only 1 out of the album's 12 or 13 tracks (depending on the configuration of the albums sold). .

---

[7] https://www.riaa.com/gold-platinum/about-awards/

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

25.     But it is not merely that Mr. Viera computes revenues based on sales that are over 80x of the actual sales of the album (on which DBS is but one track), but as noted above, he seems to assume that the totality of DBS is infringing instead of properly backing out 50% for the value of the lyrics and the portions of the music of DBS that are not claimed to be infringing.  And having not bothered to examine the impact of the popularity of Karol G and Tiësto, he ascribes no value for that either.  The net result is that Mr. Viera has arrived at a number for the supposed revenues from sales of the "Drive" album that never occurred and then counted the same streaming numbers that produced his inflated album sales numbers in his purported streaming revenues (and as I will explain below, he has also massively inflated the streaming numbers, and hence the streaming revenue, by including foreign streaming numbers rather than only United States streaming numbers).  While I fully understand that it is not Plaintiff's obligation to reduce revenues by deductible costs, I do think that, as a putative expert in the music industry, Mr. Viera should have at least noted that the revenue numbers would be subject to reduction to account for typical costs such as the cost of recording, manufacturing and distributing phonorecords, marketing expenses and the share of the revenue retained by retailers, both physical and digital (as well as overhead and taxes).

26.     Similarly, Mr. Viera calculates earnings on 500,000 single sales based on DBS's RIAA Gold certification. Once again, this certification is based on equivalent units and not on actual sales of a single. The RIAA website clearly states, "Both downloads and on-demand audio and/or video single streams are counted towards the required thresholds. The formula of 150 on-demand streams is equivalent to one download sale."[8]

27.     Based on Luminate data, there were only 25,801 singles of DBS sold in the United States through March 2, 2025. The song's U.S. on-demand audio & video streams are 194,529,281. Based on the RIAA's conversion ratio, these streams would equate to 1,296,862 single sales (which are not actual sales, it is simply a proxy done by the RIAA for gold and platinum certifications), which actually would qualify it for RIAA's Platinum certification (awarded to songs that achieve over 1,000,000 units).

---

[8] https://www.riaa.com/gold-platinum/about-awards/

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

28.     Once again, Mr. Viera's use of RIAA certification as a basis for "sales" has led him to massively inflate his calculation of the earnings of DBS from supposed sales of single recordings.  The actual gross earnings of DBS single sales should be based on 25,801 units sold (only 5.2% of the total that Mr. Viera uses).  And again, one then must also reduce the value produced by those sales by the indisputably non-infringing elements: the lyrics, the portions of the music that are not even alleged to be infringing and the value attributable to the popularity of Karol G and Tiësto.  Further, as with album sales, the gross revenue from the sale of singles also gets reduced by the cost of recording, manufacturing and distributing phonorecords, marketing expenses and the share of the revenue retained by retailers, both physical and digital (and taxes and overhead).  Again, while Mr. Viera was not obligated to deduct costs, as an expert opining on "profits" I do think he should have at least acknowledged that there are deductible costs.

29.     In addition to double counting (because he includes streaming equivalents in his calculation of physical and digital sales), Mr. Viera also further massively inflates the streaming count and the economic value of the streams by calculating supposed Spotify streaming earnings based on Spotify's listed worldwide total of 748,348,286.  But this is an infringement action limited to the United States.  While Luminate does not break out individual DSPs, across all on-demand audio streaming (meaning not merely Spotify but Amazon, Apple Music, Tidal, etc.), DBS's U.S. total is 157,622,571, which is 21.06% of Mr. Viera's total.  In other words, if one were comparing Spotify's actual US streams of DBS to Mr. Viera's worldwide number, it would be far less than 21.06% of Mr. Viera's total.  According to Digital Music News[9], Spotify controls about 36% of the US on-demand streaming market, so the total Spotify U.S. streams should roughly be 36% of 157,622,571 or about 56,744,126 streams, 7.58% of Mr. Viera's total.  Thus, Mr. Viera has inflated the Spotify streaming numbers and income by roughly 13.2x.

30.     Mr. Viera calculated YouTube streaming earnings based on YouTube's listed total of 533,548,871 (combined total of official music video, official music video part 2, and

---

[9] https://www.digitalmusicnews.com/2024/07/05/music-streaming-market-share-us/#:~:text=With%20this%20pertinent%20background%20information,as%20of%20February%20of%202024.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

official "behind the scenes" video). However, again, Mr. Viera has materially inflated the YouTube numbers because he uses a global number not the U.S. number. Luminate lists total U.S. video streams of 36,906,715, which is 7.3% of Mr. Viera's total. Luminate does not isolate YouTube from other video streaming, but it is a fair assumption that YouTube is the vast majority of the total.

## VI.    ADJUSTING THE ROYALTY CALCULATIONS

31.    Mr. Viera calculates that DBS's total income (masters and publishing) from album sales, single sales, Spotify, and YouTube amounts to $6,422,388 (again, before addressing his $42 million additional "claims"), based on his incorrect streaming and sales totals. He also makes no adjustment for the alleged infringing portion of the song, nor for the earnings that the U.S. publishers must contractually pay to the foreign publishers and writers.

**Mr. Viera's Earnings Calculations:**

| Earnings Category | Viera Activity | Viera Rate Applied | Viera Calculation |
|---|---|---|---|
| Album Sales - Master | 580,000 | $1.00/sale | $ 580,000 |
| Single Sales - Master | 500,000 | $1.00/sale | $ 500,000 |
| Spotify Streams - Master & Pub | 748,348,286 | $0.005/stream | $ 3,741,741 |
| YouTube Views - Master & Pub | 533,548,871 | $3.00/1,000 views | $ 1,600,647 |
| Album Sales - Publishing | 580,000 | $0.12/sale | $ 69,600 |
| Single Sales - Publishing | 500,000 | $0.12/sale | $ 60,000 |
| **Total Earnings Calculated by Mr. Viera** | | | **$ 6,422,388** |

32.    As stated, SMP and BMG (which is not a defendant in this case) obtain the right to sub-publish DBS in the US pursuant to agreements entered into with the originating foreign publishers that have the agreements with the songwriters. It is the foreign originating publishers that are obligated to pay the songwriters and as a result, they are paid between 85% and 90% of the US compositional revenue received by the US sub-publishers. Here, 71.25% of the publishing interest in DBS is foreign originated: SMP UK and SMP Holland own 47.5% of the song DBS, and BMG Holland owns 23.75% of the song DBS. It is my understanding that the U.S. sub-publishers (SMP US and BMG US) take a 15% fee before remitting the rest to these foreign publishers (and in fact, based on the actual US revenues of DBS shown below, SMP US remits 85% to the foreign publishers). Kobalt's 28.75% of the song is U.S. based. Based on those figures, roughly 60.6% of publishing earnings are

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

contractually required to be paid out to foreign entities and are therefore not part of the profits of SMP US (which is a defendant) or BMG US (which is not a defendant and therefore I understand its profits are not at issue in this case). As such, not only is the 85% of US compositional revenue that SMP US must remit to the originating publishers in Holland and the UK not a part of the copyright "profits" calculation, the share of US publishing revenue retrained by BMG US is also not a part of the copyright profits calculation.

33. I understand that the defendants deny any infringement and have provided an expert report from Dr. Lawrence Ferrara showing that what Plaintiff claims is infringing exists in prior art. But even if Plaintiff could sustain a claim of infringement, all earnings of DBS would have to be apportioned so that only that which is allegedly infringing would be subject to a claim. Typically, 50% of the value of a musical composition with both music and lyrics is accorded to each of the music and the lyrics. AD has no lyrics and hence the lyrics of DBS cannot be infringing. And of the remaining 50% of the song, I have been advised by counsel that there are only a few scattered notes contained in only 15.6% of the bars that



are in both songs that are not found in prior art (but I have not reduced my percentages to reflect that the few bars that contain common notes only have a few scattered notes in common). This leaves just 15.6% X 50% or 7.8% of the song as being potentially infringing. This also does not take into account the popularity of Karol G and Tiësto in producing sales (which I note but have also not accounted for in my analysis).

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

## VII.   ACTUAL DBS EARNINGS

34.   Based on the P&L statement from Atlantic Records, covering DBS's earnings from inception through January 2025, the song's actual label earnings are $802,634.35. Adjusted for the alleged infringing portion of the song (7.8%), label earnings are $62,605.48.

**"Don't Be Shy" Atlantic P&L U.S. Only ITD-Jan 2025**

| | | |
|---|---|---:|
| Digital Sales | | |
| Download - Tracks | $ | 22,928.53 |
| Download - Video | $ | 1,090.60 |
| Mobile | $ | 5,048.00 |
| Streaming - Audio | $ | 1,155,448.30 |
| Streaming - Video | $ | 352,325.99 |
| Streaming - DMCA | $ | 142,646.34 |
| Total Digital Sales | $ | 1,679,487.76 |
| | | |
| Variable Costs | | |
| Artist Royalties | $ | (482,156.91) |
| DMCA - Artist Expense | $ | (40,876.37) |
| Copyright Royalties | $ | (6,385.92) |
| AFM/AFTRA | $ | (16,794.88) |
| Distribution | $ | (11,065.72) |
| Total Variable Costs | $ | (557,279.80) |
| | | |
| Gross Margin | $ | 1,122,207.96 |
| | | |
| Direct Costs | | |
| Marketing Spend | $ | (319,573.61) |
| | | |
| **Net Contribution** | **$** | **802,634.35** |

35.   The Artist Royalties (including what the P&L lists as "DMCA – Artist Expense") are $523,033.28 (inclusive of DMCA royalties). Adjusted for the alleged infringing portion of the song (7.8%), artist royalties are $40,796.60.

36.   Although not included on the P&L for DBS, net physical sales for the album "Drive" totaled $62,666. DBS's share, as 1/12[th] of the physical album, is $5,222.17. Adjusted for the alleged infringing portion of the song (7.8%), net physical sales are $407.33.

37.   Altogether, masters earnings at the alleged infringing share come to $103,809.40.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

| Summary of U.S. Masters Earnings | Total Earnings | Alleged Infringing Portion | Total After Adjustments |
|---|---|---|---|
| Atlantic Records P&L | $          802,634 | 7.8% | $               62,605.48 |
| Net Physical Sales | $              5,222 | 7.8% | $                    407.33 |
| Artist Royalties | $          523,033 | 7.8% | $               40,796.60 |
| **Total Masters Earnings at Alleged Infringing Share** | | **$** | **103,809.40** |

38.   Gross U.S. publishing royalties earned by Sony Music Publishing for its 47.5% interest in DBS are $240,713.55. Sony Music Publishing pays out $204,141.58 to the foreign writers and publishers (none of whom are defendants in this action) and retains roughly $36,571.97 in the United States, or essentially the 15% I noted in paragraph 32 that is commonly retained by U.S. publishers when a song has been originated by a foreign publisher.

39.   Gross U.S. publishing royalties earned by Kobalt for its 28.75% interest in DBS are $134,057.54. There is no foreign payout, so this is solely U.S. income. As I said, it is my understanding that BMG US is not a defendant in this case.  As a result, its share of the United States publishing income (most of which I assume is paid in any event to its foreign originating publisher for payment to the songwriter signed to that publisher), is not at issue in this case and I have therefore not calculated its share of US income.

40.   In total, Defendants' U.S. publishing revenue for DBS amounts to $170,629.51. Adjusted for the alleged infringing portion of the song (7.8%), the total is $13,309.10.

| Publisher | Share of DBS | Gross Amount | Client Royalty Amount (Foreign Payout) | NPS Retained in U.S. |
|---|---|---|---|---|
| Sony Music Publishing | 47.50% | $          240,713.55 | $          204,141.58 | $   36,571.97 |
| Kobalt | 28.75% | $          134,057.54 | $                         - | $ 134,057.54 |
| **Defendants' Total U.S. Publishing Earnings** | | | | **$ 170,629.51** |
| **Defendants' Total U.S. Publishing Earnings at Alleged Infringing Share (7.8%)** | | | | **$   13,309.10** |

41.   In total, the masters and publishing profits at the alleged infringing share are $117,118.51. This is 1.8% of the $6,422,388 estimate put forth by Mr. Viera, even though his estimate only included specific sources (i.e., Spotify, YouTube), and the actual earnings include all sources. If I include the complete $48,551,987.61 claim made by Mr. Viera, which I will discuss in the next section, then DBS's actual earnings at the alleged infringing share are a miniscule 0.2% of his total.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

42.   Mr. Viera applied a masters rate of $1 per album sale (which, as discussed above, is inflated by some 80x the number of units sold due to the album equivalents of streaming).  As shown above, the actual numbers from Atlantic are vastly less than what Mr. Viera has speculated them to be.  In addition, Mr. Viera has not reduced his calculation to account for the value of the lyrics and those portions of the music that are not alleged to be infringing.  He also did not take into account the popularity of Karol G and Tiësto in producing sales (which I note but have also not accounted for in my analysis).

43.   Mr. Viera applied a masters rate of $1 per single sale (digital download), which again is inflated by a factor of almost 20x the number of singles actually sold due to the single equivalents of streaming. Again, the Atlantic P&L numbers show his speculated numbers to be completely baseless.

Mr. Viera assumed a Spotify per stream rate of $0.005 per stream (although page 68 of his report actually states two completely different rates – "0.05 cents for every streams [sic]" and "$0.05 for every stream" – his actual calculation of $3.74 million is based on a third rate, $0.005 per stream). I assume his rate is supposed to represent a combined masters and publishing rate.  However, again, as shown from the actual composition and recordings numbers, Mr. Viera has massively inflated the streaming numbers, as discussed above, by using world-wide figures instead of just United States Spotify figures (which increases the numbers by a factor of some 13x).  And again, Mr. Viera has not reduced his numbers to account for the value of the lyrics and those portions of the music that are not alleged to be infringing.  He also did not take into account the popularity of Karol G and Tiësto in generating streams.

## VIII.   PLAINTIFF'S EXPERT'S DAMAGES CALCULATIONS HAVE NO BASIS IN REALITY

44.   Starting on page 80 of his report and running through page 91 of his report, Mr. Viera sets forth a listing of various categories of losses supposedly suffered by Plaintiff and/or supposed amounts made by the defendants that comprise what he has claimed are "Damages Estimate, Author Royalties, Etc."  His astounding total comes to $48,551,987.61 (inclusive of his claim of $6,422,388 addressed above) or some $42 million in additional claims.  But as I will discuss below, with the exception of the supposed gross

income earned by defendants in the United States from the DBS composition, single recording, album recording and videos (which I have already addressed and shown total only $117,118.51), Mr. Viera simply states multi-million dollar numbers for claims that he asserts exist without providing the slightest basis for any of the amounts he claims.

45. With respect to the defendants' supposed income from DBS in the United States, my computation, unlike Mr. Viera's, is limited to the United States and is based on the actual sales and streaming data for the United States (and properly deducts the share of income that is required to be remitted to the foreign publishers and writers, who are not defendants in this case). My computation also reflects an apportionment between allegedly infringing elements in DBS and those elements (lyrics and most of the music) that are not alleged to be infringing. Even without factoring in the impact of the popularity of Tiësto and Karol G, my computation amounts to 1.8% of Mr. Viera's massively inflated number of nearly $6.5 million.

46. When one goes through the categories of Mr. Viera's damage claims, it is apparent that he misapprehends the difference between damages and profits under the Copyright Act. Damages are the losses suffered by a plaintiff that are separate from, and different than, the profits of the alleged infringer. But Mr. Viera's various categories of alleged damages, which provide no explanation for how he arrived at his multi-million dollar numbers, on their face, are duplicative of his already inflated $6.5 million claim addressed above.

47. On page 80, Mr. Viera's first claim is for $2 million, which he states is the actual economic loss suffered by Plaintiff. He states that this is Plaintiff's loss of income. But unless this is "income" he supposedly would have received from DBS – which is completely duplicative of Mr. Viera's $6.5 million claim for the defendants' supposed profits – there is no basis provided for how the Plaintiff could have suffered such an alleged loss. As shown above, AD has generated virtually no income from streaming or video (nor have I found any meaningful sales of any of recordings of AD). Plaintiff's complaint alleges that there have been less than 1,500 views of AD on YouTube despite being available for over 12 years. Even if one assumed that Mr. Viera's $1 to $3 per 1000 views were the correct valuation, it means that AD generated total income of between $1.50 and $4.50 from YouTube since 2012. That hardly supports a supposed loss of $2 million.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

48.   Further, as shown above, the streaming data shows Plaintiff generated an average of 29.3 streams a quarter (audio and video) (before being inflated by the temporary spike after he sued) or 99.16 streams a year.  Taking that level of streaming for the last 5 years yields a total number of streams of about 496 streams.  Multiplying that by Mr. Viera's per-stream payment of .005 yields a total value of about $2.50 of streaming income for AD over 5 years.[10]  In no way does that support a claimed loss of $2 million (on the contrary, as shown above, the public announcement of his lawsuit temporarily increased the number of streams and increased both his income and the average number of streams).  In short, Mr. Viera provides no basis for a supposed $2 million loss allegedly suffered by Plaintiff.  AD has earned virtually nothing for the past 5 years and Plaintiff's "loss" is, at most, a few dollars.

49.   Mr. Viera's next category of alleged "damage" is an additional $2 million for supposed unreceived author royalties.  While this has a separate title from the first category, it is either the exact same supposed loss or it is, again, the same as Mr. Viera's claim for the defendants' profits.  Thus, it is either duplicative of the claim for supposed compositional income earned by DBS in the United States (a portion of the $6.5 million addressed above) or it duplicates the same baseless $2 million of supposed economic losses suffered by Plaintiff in Mr. Viera's first category.  Either way, there is no basis provided for this claim whatsoever.

50.   Mr. Viera's next category is for $4 million for the supposed artist master royalties received by Tiësto and by Karol G.  There is no basis whatsoever provided for this number.  First, Mr. Viera has no knowledge of what their artist royalties have been (and his assumption is massively inflated by his use of worldwide streaming and video numbers instead of US numbers and by his erroneous inclusion of album and single equivalents from streaming rather than the actual and minimal sales of the album and single - thereby double counting the same streaming numbers).  Second, to the extent this is not the supposed loss suffered by Plaintiff, this completely unsupported $4 million claim duplicates Mr. Viera's claim

---

[10]   Even if one uses the temporarily spiked figure of 10,212 streams on the announcement of this lawsuit, which swiftly dropped in subsequent quarters down to some 924 streams by the end of 2024 and uses only the two year average, the total number of streams would be less than 20,000.  At a per stream rate of $.005, Plaintiff's total streaming revenue might have approached $100 for the two years with the attention drawn to his song by his announcement of this case.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

with respect to the supposed profits from the single and album and the streaming and video revenue.  And if this claim is supposed to reflect Plaintiff's alleged loss of artist master royalties from AD, it is baseless as AD's earnings over the last five (or more) years are negligible.

51.    Mr. Viera's next category of alleged damage is another $2 million for supposed unreceived author royalties for remixes.  Again, Mr. Viera seemingly plucks his numbers from thin air.  Not only is there nothing in Mr. Viera's report that provides any factual or economic basis for this claim, it is also exactly the same claim as the first claim (Plaintiff's supposed $2 million economic loss – which as discussed above, has no basis in reality) and the second claim (the unreceived author royalties, which also has no basis in reality).  As shown above, I have already computed all of the compositional streaming, video and mechanical and other income from the sales of albums and singles.  That captures the income from remixes.  This claim is thus not only presented without any basis, but it is entirely duplicative of the compositional portion of the $6.5 million claim addressed above.  And if it is instead a supposed loss suffered by Plaintiff, it is again duplicative of the first $2 million claim and there is no possible loss remotely close to $2 million that Plaintiff could have suffered given the miniscule income earned by AD.

52.    Mr. Viera's next category is for $4 million for the supposed artist master royalties received by  Tiësto and by Karol G on remixes.  This entirely duplicates the other non-existent $4 million category set forth above.  Again, Mr. Viera has no knowledge of what their artist royalties have been (and as I have shown above, his assumption is massively inflated by his use of worldwide streaming and video numbers rather than US only numbers and by his erroneous inclusion of album and single equivalents from streaming to inflate the sales of the album and single and double counts the streaming numbers).  Further, as with the prior $4 million artist royalty claim, this completely unsupported $4 million claim doubly duplicates Mr. Viera's claim with respect to the supposed profits from the single and album (which already incorporates all mixes and remixes of the recording).  Thus, not only does this claim have no economic basis, but I understand that it is also contrary to the Copyright Act as the supposed losses duplicate the "profits" claim.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

53.     Mr. Viera's next category appears to be his "video" claim based on worldwide numbers. I have addressed his video claim above. It is massively inflated as I have shown.

54.     Mr. Viera then has a section of his report that advances additional claims based on what he says is the "Extent of Plagiarism and/or Unauthorized Copying of Don't Be Shy" (I believe he probably means alleged copying of "Algo Diferente"). Mr. Viera sets forth a series of alleged violations of various sections of the Copyright Act (which I understand to be legal issues for the lawyers and the Court, not for Mr. Viera) and at the end, he alleges a violation of Moral Rights under Section 106A of the Copyright Act and advances a claim of $5 million. He provides nothing to quantify this alleged claim, like all of the $42 million in claims in this section of his report, it exists in thin air.

55.     But even if Mr. Viera could quantify this claim, it does not exist. Instead, I am advised by counsel that Mr. Viera is confused about what is a "work of visual art," which is the only thing that is covered by Section 106A. This case involves a claim of the infringement of a musical work. A musical work, whether composition or sound recording, is not a visual work of art. There is no "Moral Right" of which I am aware in a musical work and I am advised there is none.

56.     Second, to the extent that Mr. Viera believes that videos embodying DBS constitute a work of visual art – and his report at page 42 states his view that videos are protected by "Moral Rights," I am advised by counsel, he is wrong. Based on further advice from counsel I would suggest he examine the definitions of an audio-visual work (which are the videos to which Mr. Viera refers) and a work of visual art, both of which are set forth in Section 101 of the Copyright Act. A work of visual art expressly excludes audio-visual works from being a work of visual art. Thus, there is no "moral right" violated by any videos and no possible recovery for a claim that does not exist. This $5 million claim has no basis in fact or in law.

57.     Mr. Viera's report then has another category called "Massive Infringements." Mr. Viera refers in this section to alleged infringements around the world. But this case involves only the alleged infringement of AD by DBS in the United States. So it is unclear what Mr. Viera is talking about as it seems to have no relevance to this case.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

58.    In any event, at the end of this section, Mr. Viera again announces a second $5 million claim for the alleged violation of Plaintiff's Moral Rights.  Again, not only has Mr. Viera not quantified any such claim (or explained how or why it differs from his first baseless "moral rights" claim), as shown above, I am advised that a music infringement claim, whether in videos or otherwise, provides no basis for a "moral rights" claim under the United States Copyright Act.  The $5 million claim has no legal or factual basis.

59.    Mr. Viera's next "category" of damage is labeled "Violations of Monetary Rights."  His listing of alleged rights seems to be simply an itemization of Plaintiff's alleged rights under Section 106 of the Copyright Act, putting forth a claim of $5 million for the alleged violation of Plaintiff's alleged Section 106 rights.   His analysis either duplicates Plaintiff's inflated "profits" claim, in which case I understand that it is improper under the Copyright Act, or, if it is a supposed damages claim addressed to the supposed losses suffered by Plaintiff, it is entirely baseless.  As shown above, the economic value of AD over the course of at least the last 12 years has been virtually nil.  DBS has not caused Plaintiff to suffer any economic loss because AD has had no meaningful economic value that has been lost (indeed, Plaintiff's claim in this case has caused AD to temporarily increase its streams, thereby creating more value than it otherwise has had).

60.    Also in this section, Mr. Viera advances yet another $5 million claim for violation of the Plaintiffs' alleged "Moral Rights."  For the same reasons stated above, Plaintiff has no such claim.

61.    Mr. Viera then has a further claim that he lists as "Defendants' Profits."  He lists a value of $2 million but fails to provide any explanation for what it is or where it comes from.  If it is something other than the "profits" I have already addressed above (from the composition DBS, the single and album sales, the streaming and the video, all of which Mr. Viera has massively inflated), then I do not know what it could be (and his report does not tell us).  If it is those elements of "profits" then Mr. Viera is again simply double counting.  In either event, there is no support provided for this claim, whatever it is, and it is at best, duplicative of the $6.5 million claim I have already addressed (and that is worth only some $117,118.51).

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

62. Finally, Mr. Viera estimates $2 million in SoundExchange earnings.  He provides no description of how he came to that number and it is unclear if this category is some alleged loss that Mr. Viera claims Plaintiff suffered or some additional income supposedly earned by DBS.  If it is the former, it is hugely inflated because, as noted above, Plaintiff's song and recording has had virtually no streams and no income.  If it is the latter, the actual earnings from the Atlantic P&L for "Streaming – DMCA" are $142,646.34, or $11,126.41 when adjusted to the alleged infringing share. This is 0.6% of Mr. Viera's $2 million number.[11]

63. Not only does the Atlantic P&L totally refute Mr. Viera's presumption about SoundExchange, the number is inflated (and Mr. Viera provides nothing to support it because he cannot).  SoundExchange's total distributions for all works (to all artists) from 2H21 (when DBS was released) through 2024 are $3,510,250,000.[12]  By Mr. Viera's calculation, DBS would make up 0.057% of the total.  But there is no basis for such a percentage (and the actual numbers provided by Atlantic prove it)

64. On page 91 of his report, Mr. Viera then lists all of the dollar claims he has made and comes to a total of $48,551,987.61 (including his $6.5 million addressed in the first section of this rebuttal report).  As shown above, that number includes the following amounts for which Mr. Viera has provided no support, which are legally unfounded and/or are duplicative:

   a.   $2 million:  Plaintiff's alleged loss of income (unsupported and contrary to the negligible income actually earned by AD);

   b.   $2 million:  Plaintiff's alleged "unreceived author royalties (unsupported and either duplicative of category 1 or portions of the inflated "profits" claim);

---

[11] This amount is already included within the song's total earnings of $117,118.51.

[12] Sources of SoundExchange distributions: https://www.soundexchange.com/2022/01/31/2021-total-gross-distributions/ , https://www.soundexchange.com/2024/01/22/soundexchange-distributes-1-billion-in-digital-royalties-to-creators-in-2023/ , https://www.soundexchange.com/news/soundexchange-surpasses-12-billion-cumulative-distribution-milestone/

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

c.    $4 million:   Plaintiff's "unreceived artistic master royalties (unsupported and duplicates portions of the inflated "profits" claim);

d.    $2 million:   Plaintiff's "unreceived author royalties for remixes" (unsupported and duplicative of both the portions of the inflated "profits" claim and  items 1 and 2 above);

e.    $4 million:   Plaintiff's "unreceived artistic master royalties for remixes" (unsupported and duplicative of both portions of the inflated "profits" claim and item 3 above);

f.    $5 million:  Plaintiff's "moral rights" claim (unsupported, as there is no such claim under US copyright law for music, or for music videos);

g.    $5 million:  Plaintiff has a second "moral rights" claim (unsupported, as there is no such claim under US copyright law for music or for music videos);

h.    $5 million:   Plaintiff's "violation of monetary rights" claims (unsupported and unclear if it is a supposed claim for alleged losses, which Plaintiff did not suffer or duplicative of portions of the inflated claim for profits);

i.    $5 million:   Plaintiff's third "moral rights "claim (unsupported, as there is no moral rights claim under US copyright law for music or videos);

j.    $2 million:  Plaintiff's claim to defendants' profits (unsupported and duplicates the compositional and recording claim of $6.5 million, which is itself inflated);

k.    $2 million: Plaintiff's claim to SoundExchange income (unsupported and vastly overstated, compared  to an actual value of $11,126.41); and

l.    $4 million:  Plaintiff's claim for "other digital platforms (nowhere mentioned in report nor supported nor calculated and massively inflated).

65.    On top of the foregoing $42 million of completely unsupported claims (that are duplicative of each other and of Plaintiff's "profits" claims or non-existent under US copyright law), Mr. Viera has advanced some $6.5 million in his grossly inflated "profits" claim with respect to the compositional publishing income, sound recording income and video income. I have addressed these claims above and shown that the actual value of these claims, once one corrects for Mr. Viera's inclusion of foreign streaming data, his misunderstanding of

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

RIAA certification data (which inflated the modest sales of both singles and albums), deducts the compositional income that has been remitted to the foreign publishers and songwriters (who are not defendants in this case) and then properly apportions the remaining compositional and recording income between allegedly infringing and non-infringing elements of DBS (including the lyrics), totals $117,118.51.

## IX.   SUMMARY OF OPINIONS

66.   Mr. Viera's report is substantially unsupported and invents numbers out of thin air.  He misunderstands the data he uses, failing to recognize that it includes foreign streaming numbers and that his presumed sales figures are not sales at all but streaming equivalents that RIAA uses (which he then double counts in his streaming numbers claim).  He fails to apportion between allegedly infringing elements and elements that are not alleged to infringe (he instead seems to assume that 100% of DBS is alleged to be infringing, which is not the case).  He appears not to understand that the Copyright Act bars duplicating a profits claim in a damages claim and he includes $15 million in "moral rights" claims that does not exist under the Copyright Act's limitation of "Moral Rights" to works of visual art, which do not include music or music videos.  I would also note that his report does not contain any information about his background (there is no CV attached) nor is there any information about his compensation, both of which I understand to be a requirement of the Federal Rules.

Barry M. Massarsky

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

## Appendix A:  Curriculum Vitae of Barry M. Massarsky

**Qualifications**

1. I am by training and profession a music industry economist. Throughout my 40-year career in the study of music, I have specialized in performing economic and market analyses for both sound recordings and musical works.

2. I earned a Bachelor of Arts degree, cum laude, from Boston University in 1977, which included numerous courses in economic analysis. I earned a Masters of Business Administration degree from Cornell University in 1981. My MBA studies had an emphasis in managerial and industrial organization economics.

3. From 1977 to 1979, I was employed as a litigation economist with the United States Department of Justice. My role was to conduct economic analyses in connection with the government's antitrust suit against IBM.

4. I have been studying music use trends on commercial radio for four decades. From 1981 through 1992, I was employed as an economist by the American Society of Composers, Authors and Publishers (ASCAP). In 1987, I was promoted to Senior Economist, the position I held until my departure from ASCAP in 1992.

5. In 1992, I started an economic consulting firm named Barry M. Massarsky Consulting, Inc. My firm provided advisory consulting services to a host of music industry clientele relating to strategies affecting music licensing and royalty earnings. The firm employed three other economists including my partner, Ms. Nari Matsuura.

6. In 2022, we sold Barry M. Massarsky Consulting, Inc to Citrin Cooperman, I am now a Partner and co- Leader of its Music Economics and Valuation Services Practice.

7. Beginning in 1992, I provided consulting services for the Recording Industry Association of America (RIAA) with respect to performing rights matters. Through these consulting services for the RIAA, I have become closely acquainted with the business conditions and industry matters that affect record companies' decision making.

8. In 2001, I began advising a new performance rights collective, SoundExchange, which directs royalty payments to artists and recording companies. (SoundExchange was initially a division of RIAA and was spun off as an independent organization in 2003.)

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

9.  Through my new role at Citrin Cooperman, I continue to serve several of the music publishing companies including Universal Music Publishing Group, SONY Music Publishing, Warner Chappell, Spirit Music Group, Round Hill Music, Primary Wave and Reservoir Media. My evaluation of royalty streams for these firms spans all significant music genre classifications. Further, my firm has provided consulting services for well-known composer catalogues such as Marvin Hamlisch, the Estate of George Gershwin, Diane Warren, the Guess Who, Pete Townshend, Lionel Richie, Paul Simon, Green Day, Metallica and many others.

10. Since 1993, I have provided consulting services to SESAC, a performing rights competitor to ASCAP, including the economic appraisal of music repertory valuation and the modeling of innovative music license approaches.

11. From 2000 to 2013, my firm had also directly consulted for Nielsen BDS and SoundScan. We continue to be familiar with their services for the music industry.

12. My firm is also recognized as a premier music catalog valuation firm for all forms of music asset transactions within the music industry. The lending capital sources for these transactions, the commercial banks, hold us on their short list as "a preferred valuation team for the music industry." A significant portion of all music publishing copyright transactions are handled by my office including overall portfolio valuations of the enlarging music investible funds marketplace such as Hipgnosis Songs, Reservoir Media, Spirit Music Group, Round Hill Music, Primary Wave, Influence Media, Shamrock Capital and Peer.

13. I have authored "The Operating Dynamics behind ASCAP, BMI and SESAC, The U.S. Performing Rights Societies," which appeared in Technological Strategies for Protecting Intellectual Property in the Networked Multimedia Environment, Volume 1, Issue 1, January 1994, pp. 217-225.

14. I have often been quoted in the media concerning business developments and transactions within the music industry, including 2018 in The New York Times. I was also quoted in Forbes and in 2010, I was interviewed on The Today Show regarding the value of the

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

Michael Jackson estate. As recently as January 19, 2022, I was featured in The Wall Street Journal. I have also been quoted in the national media about the music industry.

15.    I have spoken at several professional seminars including the Copyright Society of the South, the Association of Independent Music Publishers (AIMP) for both the Nashville and Los Angeles branches, the CMJ Music Forum in New York and The Hollywood Reporter/Billboard Film/TV Music Conference in Los Angeles, as well as private bank presentations for SunTrust and City National Bank. I have been asked to speak at the South by Southwest music festival in Austin, Texas. I frequently appear as a speaker at educational events and continue to be sought out for public speaking events that focuses on issues concerning the music industry.

**Litigation Experience (2022 – 2025)**

16.    In 2022, I served as an expert witness in *Sean Hall et al. v. Taylor Swift, et al.*, a copyright infringement case concerning the song "Shake It Off."  I provided an expert report and gave a deposition in August 2022.

17.    In 2025, I just served as a rebuttal expert in Kobalt et.al v Orlando Magic which was a music infringement case centered on unlicensed uses found on the basketball team's social media. I was deposed in that case on February 28, 2025.

18.    In 2025, I am scheduled to reprise my expert witness role before the Copyright Tribunal in Sydney, Australia on behalf of the Australian record labels for the determination of a reasonable rate for music performed on local terrestrial radio.

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).

## Appendix B: Documents Considered

Documents considered includes all documents cited in this report, including Mr. Viera's report, the "sources identified therein and the sources I have identified in my report.

_____

Barry M. Massarsky

"Citrin Cooperman" is the brand under which Citrin Cooperman & Company, LLP, a licensed independent CPA firm, and Citrin Cooperman Advisors LLC serve clients' business needs. The two firms operate as separate legal entities in an alternative practice structure. Citrin Cooperman is an independent member of Moore North America, which is itself a regional member of Moore Global Network Limited (MGNL).