# EXHIBIT F

1          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
2                MIAMI DIVISION
          CASE NO. 24-23066-CIV-ALTONAGA/Reid
3

4

   RENE LORENTE-GARCIA,
5
            Plaintiff,
6
   -vs-
7
   CAROLINE GIRALDO-NAVARRO, et al.,
8
            Defendants.
9                                    /

10

11   * * * * * * * * * * * * * * * * * * * * * * * * * *
                    VOLUME 1
12                PAGES 1 - 162

13
   VIDEOTAPED
14   DEPOSITION OF:      RICHIE VIERA

15   DATE TAKEN:         TUESDAY, APRIL 8, 2025

16   TIME:              9:04 A.M. - 5:44 P.M.

17   PLACE:              BY ZOOM

18   REPORTED BY:        CARMEN THOMAS, REGISTERED
                         PROFESSIONAL REPORTER AND
19                       NOTARY PUBLIC

20
   * * * * * * * * * * * * * * * * * * * * * * * * * *
21

22

23

24

25



```
 1   I can read the language.
 2          My question is, do you consider yourself to
 3   be an expert musicologist?
 4      A    That is correct.
 5      Q    Okay.  And, sir, what do you understand that
 6   a musicologist is?
 7      A    I am here to answer the questions, not to
 8   conduct analysis or to give lectures.  I have been
 9   recognized as a musicologist and I have been awarded a
10   Platinum album that was granted to me as a musicologist.
11      Q    That's not my question.
12          My question is, what do you understand a
13   musicologist to be?
14      A    Can you please expand on your question and
15   state what you want to know?
16      Q    Sure.  It's pretty simple.
17          You list yourself as a musicologist on your
18   CV and I'm asking you plainly and simply, what do you
19   understand a musicologist to be?
20          MR. COBO-ESTRELLA:  If I may suggest, when
21      responses are given lengthy, perhaps taking a break
22      to allow the interpreter to interpret part of
23      response.
24          Could he capture everything he said?
25          THE INTERPRETER:  Yes, I will.  I've taken
```



```
 1         notes and --
 2              MR. COBO-ESTRELLA:  Si.  Interpret.
 3              THE INTERPRETER:  He says, I know the
 4         industry.  It's a combination.  I'm an expert in
 5         Latin music.  I know music.  I can compare musical
 6         compositions using musical sheets.  I recognize
 7         albums, compositions, all those years, dates and
 8         countries.  My knowledge covers a wide range and a
 9         broad scope.
10    BY MR. SAMMATARO:
11         Q    Okay.  So would it be fair to say that you
12    believe a musicologist is someone who is qualified to
13    compare two works?
14         A    Yes.  Two, three, four and many more
15    comparing two works, two compositions, two soundtracks.
16         Q    And what academic qualifications do you have
17    to serve as a musicologist?
18         A    Yes.  The best qualification that life can
19    provide, since I was 12, I've been out in the field
20    learning from experts, the greatest, the best.
21         Q    My question was -- and this is going to be a
22    very long deposition, sir, if you don't want to answer
23    my questions.  And I -- I'm happy to be here all day
24    today, Thursday.  It's really simple.
25              My question to you was, what academic
```



```
 1   qualifications do you have to serve as a musicologist?
 2           If the answer's none, just tell me it's none.
 3   Don't waste our time.
 4           MR. COBO-ESTRELLA:  Counsel, I have an
 5       objection to the --
 6           MR. SAMMATARO:  No.  You can keep your
 7       objections to form.  Your objection is to form,
 8       Humberto.
 9           MR. COBO-ESTRELLA:  Objection.
10       Mischaracterization of the witness' testimony.
11           The witness did respond to your question.
12           Are you rephrasing your question?  Is that
13       what you're doing now?
14           MR. SAMMATARO:  No.
15           Are you coaching the witness?  Please stop.
16       Limit your objections to form.  He can answer the
17       question.  He can answer the question that's
18       pending.
19           MR. COBO-ESTRELLA:  Don't raise your voice.
20       Do not yell at the witness, Counsel.
21           MR. SAMMATARO:  This is my deposition.  You
22       can conduct your deposition however you'd like,
23       sir, but speaking objections are not allowed in
24       Southern District of Florida.
25           If you're going to continue this, we will
```



1     just terminate this deposition right now and we

2     will go to the court.  I'm not going to play these

3     games.

4          This is my deposition.  I'm already indulging

5     the witness --

6          MR. COBO-ESTRELLA:  (Unintelligible).

7          MR. SAMMATARO:  Let me finish.

8          I'm already indulging the witness with an

9     interpreter and this is going to prolong the

10    deposition.

11         And if he can't -- if he's going to try to

12    dodge my questions, it's going to waste everyone's

13    time.  I want a very clean record.

14         So there's a question.  I believe he answered

15    it.  I'm waiting for the interpretation.

16         THE WITNESS:  I am ready to be here today,

17    tomorrow, Friday, Saturday, any other week if you

18    want to.  I don't have any issues.

19         I did answer to the question and I'm going to

20    ask you please, I am near to the computer, I can

21    hear loudly and okay.  You don't need to yell.

22  BY MR. SAMMATARO:

23    Q    Sir, do you have a degree in musicology?

24    A    I have 45 years of track record in the music

25  business, a wide experience and there are no cases



1      just terminate this deposition right now and we

2      will go to the court.  I'm not going to play these

3      games.

4           This is my deposition.  I'm already indulging

5      the witness --

6           MR. COBO-ESTRELLA:  (Unintelligible).

7           MR. SAMMATARO:  Let me finish.

8           I'm already indulging the witness with an

9      interpreter and this is going to prolong the

10     deposition.

11          And if he can't -- if he's going to try to

12     dodge my questions, it's going to waste everyone's

13     time.  I want a very clean record.

14          So there's a question.  I believe he answered

15     it.  I'm waiting for the interpretation.

16          THE WITNESS:  I am ready to be here today,

17     tomorrow, Friday, Saturday, any other week if you

18     want to.  I don't have any issues.

19          I did answer to the question and I'm going to

20     ask you please, I am near to the computer, I can

21     hear loudly and okay.  You don't need to yell.

22  BY MR. SAMMATARO:

23     Q    Sir, do you have a degree in musicology?

24     A    I have 45 years of track record in the music

25  business, a wide experience and there are no cases



```
 1  related to entertainment in Florida.  I'm in Puerto Rico
 2  in which I am not -- which I do not provide advice.
 3      Q    So is that a no, you don't have an academic
 4  degree in musicology?
 5      A    I have many more -- much more than a degree
 6  hanging on the wall.  I have four decades of experience.
 7  More -- I could know more than any other person that
 8  just decided -- deciding two decades ago.  I have wide
 9  experience.
10      Q    What academic institution has issued you a
11  degree in musicology?
12          If the answer's none, just say it's none and
13  we'll move on.
14      A    Both the music industry in Puerto Rico and in
15  the mainland US, they have granted me a Platinum album
16  as a musicologist.
17      Q    So the answer is no academic institution,
18  correct?
19          THE INTERPRETER:  I'm going to ask him to
20      repeat the last part.
21          THE WITNESS:  Over 45 years of experience.
22      The music industry has awarded me a Platinum album.
23      I hold a Platinum record.  I am the only Latin
24      musicologist to be awarded one.
25          I have turned down two honorary doctorates,
```



```
 1          one from the University of Puerto Rico and another
 2          one from the Puerto Rican Institute of Culture
 3          advanced studies.
 4   BY MR. SAMMATARO:
 5        Q     Is the Platinum record an academic degree?
 6        A     No.  It is way more than that.
 7        Q     And what is the Platinum record that you were
 8   awarded?
 9        A     I have answered that question for four or
10   five times.  As a musicologist.
11        Q     What's the name of it?
12        A     What's the name of what?
13        Q     This Platinum record.
14        A     A record was granted to me Richard Viera.  A
15   ceremony was held and a party was held in Los Angeles,
16   California.  It was granted by Albert Torres.  He was
17   the president of one of the largest Latin music
18   institutions.  He has passed away.
19              The -- the name of the institution that
20   awarded me the Platinum record was World Salsa Congress.
21        Q     And on the Platinum record that was awarded
22   to you by World Salsa Congress, does it say
23   musicologist?
24        A     Yes, I have a stated that several times.
25   That is correct.
```



1    Q    How can opine a work is a hundred percent
2  original without conducting a prior art search?
3    A    I was not hired to conduct a search because
4  previous art is often used as a weapon to attack.  I
5  recognize that it was a hundred percent original and if
6  I am confident of that, it is enough for me.
7    Q    How can you determine if something's a
8  hundred percent original without considering whether
9  there are preexisting works that contain the same
10  musical elements?
11    A    I use my instinct.  I use what I have here
12  when I can't smell it.  I use my ears.  I am able to
13  detect when a word is copied, when there is any sort of
14  copy.  I operate at that high level.
15    Q    Are you aware of every song that was ever
16  created in the history of man?
17         MR. COBO-ESTRELLA:  Objection, for the
18    record.  Ambiguous.  Vague.  Overbroad.
19         Go ahead.
20  BY MR. SAMMATARO:
21    Q    You can answer.
22    A    I don't think that is a serious question,
23  with all due respect.
24    Q    I don't think your last answer was serious,
25  with all due respect.



1          How can you determine whether something is
2     original unless you search for preexisting art?
3          A     You may believe my answers or you may not,
4     but I hold an instinct, something that was granted to me
5     by God.  I have a unique perception, something that
6     perhaps very few people in the music industry have.
7          Q     Do you agree that consideration of prior art
8     is essential to any musicological analysis that compares
9     the alleged similarities between two works?
10         A     I was hired to do something very simple.  I
11    reviewed the case and I was simply comparing Algo
12    Diferente versus Don't Be Shy.
13         Q     Is it your opinion that in comparing Algo
14    Diferente to Don't Be Shy you do not need to distinguish
15    between the protected and the unprotected elements
16    contained in Algo Diferente?
17         A     I first determined if it is an original work.
18    Once I have determined that it's an original work and I
19    am confident of that, I check the copy, the plagiarized
20    work, the still.  I check the original work is
21    protected.  If it's copyrighted with the copyright
22    office in Washington and then I check the copy.
23         Q     Would it be fair to say that in comparing
24    Algo Diferente to Don't Be Shy, you did not perform a
25    filtration process distinguishing between the protected



1      A      It would imply from that a live analysis of

2   music sheets presented to me relative to Algo Diferente

3   and the answer would be no.

4              MR. SAMMATARO:  You mind repeating that.  I

5         missed a little bit.

6              THE INTERPRETER:  Sure.

7              THE WITNESS:  It would imply on that a live

8         analysis of music sheets presented to me relative

9         to Algo Diferente and the answer would be no.

10             MR. SAMMATARO:  I think I'm missing the very

11        end what you're saying.

12             THE INTERPRETER:  And the answer would be no.

13             MS. SAMMATARO:  Okay.  Well, why don't we

14        just close the loop here.  What I'll mark here as

15        Exhibit D10.  Okay.

16             (Defendant's Exhibit 10 was marked for

17        identification.)

18   BY MR. SAMMATARO:

19      Q      Mr. Viera, I'm going to represent to you what

20   is on the screen, as you can see from the top, is sheet

21   music from a work called Astras De Nos.

22             Are you familiar with this work?

23             MR. COBO-ESTRELLA:  Counsel, again, same

24        objection as before.  This is not part of the

25        witness report.  We would have an objection.



```
 1        Please note it for the record.

 2              MR. SAMMATARO:   Noted.

 3    BY MR. SAMMATARO:

 4        Q    You'll see, Mr. Viera, on the very top on the

 5    second staff, there's again a red highlighted box.

 6              Are you able to identify the notes in this

 7    highlighted box?

 8        A    I have not seen these music sheets before.

 9    It is irrelevant.  Analyzing it would be a live

10    interpretation and it's not my role.  I didn't analyze

11    this piece in relation to anything else.

12        Q    Okay.  Are you unable to analyze and identify

13    the notes as you sit here today?

14        A    I could, but it's irrelevant.  My answer for

15    the comparison would be no.

16        Q    Okay.  Sir, relevance is not an objection.

17    That's sus -- that is sustainable.  So I understand your

18    view of it's not relevant.  You're not allowing me to

19    get why it's relevant.  So if you're going to refuse to

20    answer the question based on relevance, I just need you

21    to do so on the record.

22        A    I stated this twice.  My answer is no.

23        Q    No.  That you're unable to trans -- to read

24    what the notes are?

25        A    I can do a transcription.  I would need to
```



 1  have the sheet music, listen to it and see what's there,

 2  but that is not my role, so I cannot do that at this

 3  moment.

 4      Q    Okay.  I'll take that as a response.  Thank

 5  you.

 6          Let's go back to your affirmative report on

 7  page 28.  On page 28, you see that the transcription

 8  that appears contains -- or includes all 16 measures,

 9  correct?

10      A    Correct.

11      Q    And turning now to page 24 of your

12  affirmative report, here at the very top this

13  transcription only contains eight measures, correct?

14      A    Yes, they provided two to me, one with 16

15  measures and the other one with eight measures.

16      Q    Okay.  And, again, this transcription was

17  provided to you, you didn't -- you didn't transcribe it

18  yourself?

19      A    Yes, that is correct.  As I previously

20  stated, it was provided to me by Rene Lorente and I

21  reviewed it.

22      Q    Okay.  And how about the transcription of

23  Don't Be Shy that's right below Algo Diferente, did you

24  transcribe this?

25      A    It was provided to me as well, as I



1  previously stated, as part of all the material for the

2  case by Rene Lorente.

3      Q    Okay.  Do you know why Mr. Lorente-Garcia

4  omitted measures nine through 16 in the transcription

5  contained on page 24?

6      A    Well, the plagiarism is in the eight bars.

7  He doesn't need anything else because it's at the heart

8  of the song.

9      Q    Okay.  Let's turn to page 25 of your

10 affirmative report.

11          Was this transcription also -- is the

12 transcription of Algo -- strike that.

13          Was the transcription of Algo Diferente also

14 provided to you by the plaintiff?

15     A    Yes, that is correct.

16     Q    Okay.  And how about the transcription of

17 Don't Be Shy on the bottom of page 25, was that also

18 provided to you by the plaintiff?

19     A    Correct.

20     Q    Okay.  And just to close the loop, now

21 turning to page 26 of your report, at the very top of

22 page 26, is the transcription of Algo Diferente that

23 appears on page 26, was that also provided to you by the

24 plaintiff?

25     A    That is correct.



1       Q     Don't Be Shy is in a minor key, correct?

2       A     Algo Diferente is in D minor and Don't Be Shy

3   is in B minor.

4       Q     Is D minor the only key that Algo Diferente

5   uses?

6       A     There is the original key of Algo Diferente.

7       Q     And what is that original key?

8       A     I already answered.  It's D minor.

9       Q     Do you dispute that Algo Diferente changes

10  from a major key --

11            MR. COBO-ESTRELLA:  Counsel, correction.  He

12      said re menor, and the interpreter said D minor.

13      Not the same thing.  So I want to make sure that's

14      correct and any degradation, Counsel.

15            Can the witness restate his response.

16            THE INTERPRETER:  I'm sorry.  Re menor is D

17      minor in English.

18            MR. SAMMATARO:  He said D minor.

19            THE INTERPRETER:  You are disputing that

20      re menor is not equivalent to D minor in English?

21            MR. COBO-ESTRELLA:  Was it (speaking

22      Spanish)?

23            THE INTERPRETER:  Yeah, I mean, re menor in

24      English is D minor.

25            MR. COBO-ESTRELLA:  First time I hear that,



 1        but all right.

 2              THE INTERPRETER:  Because in Spanish we use

 3        (speaking Spanish).  In English they use other

 4        letters.  They don't use (speaking Spanish).

 5        And --

 6              Excuse me?

 7              MR. COBO-ESTRELLA:  You're calling it D; is

 8        that what you said?  D minor?

 9              THE INTERPRETER:  (Speaking Spanish) is D.

10        Re menor equivalent in English is D minor.

11              MR. COBO-ESTRELLA:  Okay.  Thank you for the

12        explanation.

13   BY MR. SAMMATARO:

14        Q    Would you agree with me, sir, that Algo

15   Diferente changes from a major key to a minor key?

16              THE INTERPRETER:  Give me one -- can you

17        repeat the question, please?

18              MR. SAMMATARO:  Yeah.

19   BY MR. SAMMATARO:

20        Q    Would you agree with me, sir, that Algo

21   Diferente changes from a major key to a minor key?

22        A    I did not make that musical arrangement.

23   That was Rene Lorente's work.  He would be the one to

24   explain those changes because that is his arrangement.

25        Q    But you are serving as a musicologist in this



```
 1  case, correct?
 2      A    Yes, correct.
 3      Q    Are you unable to state here under oath
 4  whether or not Algo Diferente changes from a major key
 5  to a minor key?
 6      A    I do not want to get into the structure of
 7  the arrangement because that is not my role.  I didn't
 8  do the arrangement.
 9           I prepared the report.  The report, it's
10  clear.  It's in those eight bars.  The full sheet of the
11  original arrangement isn't included because the
12  plagiarism lies within those eight bars.
13           Even the arranger himself if asked that
14  question couldn't answer just from memory.  He would
15  need to have the arrangement in front of him to be
16  clear, especially considering everything he's done
17  throughout his career.
18      Q    Algo Diferente contains bars in both 4/4 time
19  and 2/4 time, correct?
20           THE INTERPRETER:  Can you repeat that
21      question?
22           MR. SAMMATARO:  Yeah.
23  BY MR. SAMMATARO:
24      Q    Algo Diferente contains bars in both 4/4 time
25  and 2/4 time?
```



```
 1          arrangements I already declared under oath that I
 2          received them as they are.
 3               Also some covers and drawing, I did not draw
 4          anything.  I'm referring to the writing and the
 5          analysis, all of that was done by me.
 6   BY MR. SAMMATARO:
 7          Q     What does it mean for a melody to be
 8   diatonic?
 9          A     I want to refer specifically to the report.
10   What I have stated in my report is that the soul, the
11   hook of the song was violated, was stolen.  The rest are
12   matters that if they are not in my report, I cannot
13   irresponsibly speculate about.
14          Q     Sir, you purport to be a musicologist.  I'm
15   asking you a very simple musicological question.  If you
16   can't answer it, just say you can't answer it, but don't
17   waste my time and don't waste the court's time.
18               What does it mean for a melody to be
19   diatonic?
20               That has nothing to do with your report.
21   It's a simple question.
22          A     I repeat, I cannot answer that.
23          Q     You cannot answer that because you do not
24   know?
25          A     I cannot answer.
```



1    BY MR. SAMMATARO:

2        Q      What is the musicological definition of

3    "expressive color"?

4        A      There are many definitions.  It depends on

5    the person but expressive color refers to the

6    originality of the melody, a unique and expressive tone.

7    It's something that could also be considered original, a

8    distinctive thing.

9        Q      And just so I understand your testimony

10   correctly, you're saying that expressive color is an

11   accepted musicological term?

12       A      Yes.  It could be something that you say to a

13   person or a musician for him or her to be successful.

14   It refers to their originality.  It's a way of

15   explaining their unique sounds or voice.  It fits, yes.

16       Q      What is the musicological definition of

17   "essential nature"?

18       A      These could also have several definitions

19   depending on who says it and on the book, but it can

20   refer, for example, when you say that a rhythm belongs

21   to a certain genre, that is its essential nature.  The

22   musician plays in a certain way.  That is their

23   essential nature.  Just like a person whose nature can

24   be good or bad.

25       Q      What does the word "tonic" mean in



 1   musicological terms?

 2              THE INTERPRETER:  I'm sorry.  Which word?

 3              MR. SAMMATARO:  Tonic, t-o-n-i-c, tonic.

 4              MR. COBO-ESTRELLA:  Counsel, objection.

 5       Asked and answered.

 6              MR. SAMMATARO:  I never asked the word tonic

 7       once.  First time I mentioned the word in a day and

 8       a half.  So I'm going to stand on my question.

 9              MR. COBO-ESTRELLA:  So the question -- I

10       thought he had answered that question?  No?

11              MR. SAMMATARO:  No.  You interrupted him.

12              MR. COBO-ESTRELLA:  No, counsel.  I'm asking

13       if you're asking a question you already asked

14       and --

15              MR. SAMMATARO:  I never used the word tonic

16       once.  I already answered you.  You're being

17       disruptive.

18   BY MR. SAMMATARO:

19       Q    My question, to be translated, is, what does

20   the word -- what is the musicological definition of the

21   word "tonic"?

22       A    I do not recall that answer right now.  I

23   don't have it.  The definitions of tonic, diatonic, I

24   don't have those right now.

25       Q    Do you know what the "circle of fifths" is?



```
 1                THE INTERPRETER:  The circle of what, sir?

 2                MR. SAMMATARO:  Fifths, circle of fifths.

 3                THE INTERPRETER:  Fist, f-i-s-t.

 4                MR. SAMMATARO:  Yeah, fifths, f-i-f-t-h-s.

 5                THE WITNESS:  You are trying to conduct a

 6       musicology exam or test on me.  See, there are many

 7       descriptions that I looked for in books when I

 8       drafted my report that I currently cannot recall.

 9  BY MR. SAMMATARO:

10       Q    Do you dispute that there are thousands of

11  songs that use the circle of fifths?

12       A    Yes, but you're asking me for the definition

13  and I cannot provide that right now.  It seems like

14  you're asking me about many things from way before.

15       Q    I just want to be clear.  You are

16  representing that you are an expert musicologist and I'm

17  allowed to ask and test your musicological knowledge.

18  So this is entirely appropriate.

19       A    The fifths is something that exists since a

20  long time ago in times of Mozart, etcetera.  But these

21  are two different questions.  You asked about the

22  definition and it's something that I do not recall right

23  now exact.

24       Q    Can any artist own the circle of fifths?

25       A    It is a hypothetical question that I cannot
```



**Page 1**

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
             CASE NO. 24-23066-CIV-ALTONAGA/Reid
 3
 4
     RENE LORENTE-GARCIA,
 5
                    Plaintiff,
 6
 7      -vs-

     CAROLINE GIRALDO-NAVARRO, et al.,
 8
                    Defendants.
 9                                    /
10
11   * * * * * * * * * * * * * * * * * * * * * * * *
                        VOLUME 1
12                    PAGES 1 - 162
13
     VIDEOTAPED
14   DEPOSITION OF:      RICHIE VIERA
15   DATE TAKEN:         TUESDAY, APRIL 8, 2025
16   TIME:              9:04 A.M. - 5:44 P.M.
17   PLACE:             BY ZOOM
18   REPORTED BY:       CARMEN THOMAS, REGISTERED
                        PROFESSIONAL REPORTER AND
19                      NOTARY PUBLIC
20
     * * * * * * * * * * * * * * * * * * * * * * * *
21
22
23
24
25
```

**Page 2**

highlight APPEARANCES section

```
 1   APPEARANCES:
 2        Appearing on Behalf of the Plaintiff:
          HUMBERTO COBO-ESTRELLA, ESQUIRE
 3        hcobo@hcounsel.com
          Cobo-Estrella Law Office
 4        Union Plaza, 416 Ponce de Leon Ave.
          Suite 1104
 5        San Juan, Puerto Rico 00918
 6        Appearing on Behalf of the Defendant:
          JAMES SAMMATARO, ESQUIRE
 7        jsammataro@pryorcashman.com
          DONALD S. ZAKARIN, ESQUIRE
 8        dzakarin@pryorcashman.com
          BRITTANY PAGNOTTA, ESQUIRE
 9        bpagnotta@pryorcashman.com
          KANDICE SUAREZ
10        ksuarez@pryorcashman.com
          Pryor Cashman LLP
11        255 Alhambra Circle, Suite 800
          Miami, Florida 33134
12
13   ALSO PRESENT:
          Winston Vidal-Gambaro, Esquire
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                     I N D E X
 2                                              Page
 3      TESTIMONY OF RICHIE VIERA
     Direct Examination by Mr. Sammataro           6
 4   Certificate of Reporter                     160
     Certificate of Oath (Interpreter)           160
 5   Certificate of Oath (Witness)               161
 6
 7                  E X H I B I T S
 8     No.          Description                   Page

 9   Defendant's Exhibit 1    Richie Viera Curriculum    13
                              Vitae
10   Defendant's Exhibit 2    Venegas, LAMCO/ACEMLA and  38
                              Banco Popular De Puerto
11                            Rico Joint Pretrial
                              Memorandum
12
     Defendant's Exhibit 3    Curet-Velazquez v ACEMLA   44
13                            Joint Proposed Pretrial
                              Memorandum
14
     Defendant's Exhibit 4    Amended Preliminary Expert 71
15                            Report and Investigation,
                              March 3, 2025
16
     Defendant's Exhibit 5    Recording released in 1998 77
17                            called Para Que Llorar
18   Defendant's Exhibit 6    YouTube video of lo che    79
                              non vivo
19
     Defendant's Exhibit 7    Lawrence Ferrara, Ph.D.    85
20                            Affirmative and Rebuttal
                              Report
21
     Defendant's Exhibit 8    Comparative audio of lo    86
22                            che non vivo with Algo
                              Diferente
23
     Defendant's Exhibit 9    Mamblues sheet music      107
24
25
```

**Page 4**

```
 1   Defendant's Exhibit 10   Astras De Nos sheet music 112
 2   Defendant's Exhibit 11   17 U.S. Code, Section 504, 116
                              Remedies for Infringement:
 3                            Damages and Profits
 4   Defendant's Exhibit 12   Expert Rebuttal Report of 123
                              Barry M. Massarsky
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 13

1 worked.
2    Q    I'm going to put on the screen what we're
3 going to mark as Defendant's Exhibit 1.
4         (Defendant's Exhibit 1 was marked for
5 identification.)
6 BY MR. SAMMATARO:
7    Q    And we can scroll through this document, but
8 I'll represent to you that this is your CV.
9         And do you -- from looking at the first
10 page -- why don't we scroll just through a couple of
11 these pages.
12        Okay.  Looking at the second page of this
13 document you'll see it lists your curriculum vitae.
14        Do you recognize this as your CV, sir?
15   A    Yes, it is the second page of my CV.
16   Q    So if we go to the first page of your CV
17 where it lists your qualifications and if you see right
18 almost in the middle of the page, there's a reference to
19 musicologist.
20        And, sir, is that correct?  Are you an expert
21 musicologist?
22   A    This -- it says musicologist.  It does not
23 say expert in musicology.
24   Q    My question, however, is, do you consider
25 yourself -- I'm not asking what's written on the report.

Page 14

1 I can read the language.
2         My question is, do you consider yourself to
3 be an expert musicologist?
4    A    That is correct.
5    Q    Okay.  And, sir, what do you understand that
6 a musicologist is?
7    A    I am here to answer the questions, not to
8 conduct analysis or to give lectures.  I have been
9 recognized as a musicologist and I have been awarded a
10 Platinum album that was granted to me as a musicologist.
11   Q    That's not my question.
12        My question is, what do you understand a
13 musicologist to be?
14   A    Can you please expand on your question and
15 state what you want to know?
16   Q    Sure.  It's pretty simple.
17        You list yourself as a musicologist on your
18 CV and I'm asking you plainly and simply, what do you
19 understand a musicologist to be?
20        MR. COBO-ESTRELLA:  If I may suggest, when
21 responses are given lengthy, perhaps taking a break
22 to allow the interpreter to interpret part of
23 response.
24        Could he capture everything he said?
25        THE INTERPRETER:  Yes, I will.  I've taken

Page 15

1 notes and --
2         MR. COBO-ESTRELLA:  Si.  Interpret.
3         THE INTERPRETER:  He says, I know the
4 industry.  It's a combination.  I'm an expert in
5 Latin music.  I know music.  I can compare musical
6 compositions using musical sheets.  I recognize
7 albums, compositions, all those years, dates and
8 countries.  My knowledge covers a wide range and a
9 broad scope.
10 BY MR. SAMMATARO:
11   Q    Okay.  So would it be fair to say that you
12 believe a musicologist is someone who is qualified to
13 compare two works?
14   A    Yes.  Two, three, four and many more
15 comparing two works, two compositions, two soundtracks.
16   Q    And what academic qualifications do you have
17 to serve as a musicologist?
18   A    Yes.  The best qualification that life can
19 provide, since I was 12, I've been out in the field
20 learning from experts, the greatest, the best.
21   Q    My question was -- and this is going to be a
22 very long deposition, sir, if you don't want to answer
23 my questions.  And I -- I'm happy to be here all day
24 today, Thursday.  It's really simple.
25        My question to you was, what academic

Page 16

1 qualifications do you have to serve as a musicologist?
2         If the answer's none, just tell me it's none.
3 Don't waste our time.
4         MR. COBO-ESTRELLA:  Counsel, I have an
5 objection to the --
6         MR. SAMMATARO:  No.  You can keep your
7 objections to form.  Your objection is to form,
8 Humberto.
9         MR. COBO-ESTRELLA:  Objection.
10 Mischaracterization of the witness' testimony.
11        The witness did respond to your question.
12        Are you rephrasing your question?  Is that
13 what you're doing now?
14        MR. SAMMATARO:  No.
15        Are you coaching the witness?  Please stop.
16 Limit your objections to form.  He can answer the
17 question.  He can answer the question that's
18 pending.
19        MR. COBO-ESTRELLA:  Don't raise your voice.
20 Do not yell at the witness, Counsel.
21        MR. SAMMATARO:  This is my deposition.  You
22 can conduct your deposition however you'd like,
23 sir, but speaking objections are not allowed in
24 Southern District of Florida.
25        If you're going to continue this, we will



Page 17

1    just terminate this deposition right now and we
2    will go to the court.  I'm not going to play these
3    games.
4        This is my deposition.  I'm already indulging
5    the witness --
6        MR. COBO-ESTRELLA:  (Unintelligible).
7        MR. SAMMATARO:  Let me finish.
8        I'm already indulging the witness with an
9    interpreter and this is going to prolong the
10   deposition.
11       And if he can't -- if he's going to try to
12   dodge my questions, it's going to waste everyone's
13   time.  I want a very clean record.
14       So there's a question.  I believe he answered
15   it.  I'm waiting for the interpretation.
16       THE WITNESS:  I am ready to be here today,
17   tomorrow, Friday, Saturday, any other week if you
18   want to.  I don't have any issues.
19       I did answer to the question and I'm going to
20   ask you please, I am near to the computer, I can
21   hear loudly and okay.  You don't need to yell.
22   BY MR. SAMMATARO:
23   Q    Sir, do you have a degree in musicology?
24   A    I have 45 years of track record in the music
25   business, a wide experience and there are no cases

Page 18

1    related to entertainment in Florida.  I'm in Puerto Rico
2    in which I am not -- which I do not provide advice.
3    Q    So is that a no, you don't have an academic
4    degree in musicology?
5    A    I have many more -- much more than a degree
6    hanging on the wall.  I have four decades of experience.
7    More -- I could know more than any other person that
8    just decided -- deciding two decades ago.  I have wide
9    experience.
10   Q    What academic institution has issued you a
11   degree in musicology?
12       If the answer's none, just say it's none and
13   we'll move on.
14   A    Both the music industry in Puerto Rico and in
15   the mainland US, they have granted me a Platinum album
16   as a musicologist.
17   Q    So the answer is no academic institution,
18   correct?
19       THE INTERPRETER:  I'm going to ask him to
20   repeat the last part.
21       THE WITNESS:  Over 45 years of experience.
22   The music industry has awarded me a Platinum album.
23   I hold a Platinum record.  I am the only Latin
24   musicologist to be awarded one.
25       I have turned down two honorary doctorates,

Page 19

1    one from the University of Puerto Rico and another
2    one from the Puerto Rican Institute of Culture
3    advanced studies.
4    BY MR. SAMMATARO:
5    Q    Is the Platinum record an academic degree?
6    A    No.  It is way more than that.
7    Q    And what is the Platinum record that you were
8    awarded?
9    A    I have answered that question for four or
10   five times.  As a musicologist.
11   Q    What's the name of it?
12   A    What's the name of what?
13   Q    This Platinum record.
14   A    A record was granted to me Richard Viera.  A
15   ceremony was held and a party was held in Los Angeles,
16   California.  It was granted by Albert Torres.  He was
17   the president of one of the largest Latin music
18   institutions.  He has passed away.
19       The -- the name of the institution that
20   awarded me the Platinum record was World Salsa Congress.
21   Q    And on the Platinum record that was awarded
22   to you by World Salsa Congress, does it say
23   musicologist?
24   A    Yes, I have a stated that several times.
25   That is correct.

Page 20

1    Q    Okay.  Sir, have you done any
2    post-graduate -- first of all, do you have a -- did you
3    graduate from college?
4    A    I have turned down two doctorate degrees.  I
5    am a novel --
6        THE INTERPRETER:  Give me one second, sir.
7        THE WITNESS:  I have turned down two honorary
8    doctorates.  I am a novel calculator of music.  I
9    haven't needed them.  I am about to turn 60.  And
10   from 40 years, I have not needed them.
11   BY MR. SAMMATARO:
12   Q    What are the two honorary degrees that you
13   allegedly turned down?
14   A    I have answered that twice.
15   Q    What are their names?
16       I don't care if you've answered a question
17   before.  If I ask again, you're going to answer it.
18   Okay?  So let's just stop playing games, Mr. Viera.
19       The question is, what are the names of the
20   degrees that you allegedly turned down?
21       MR. COBO-ESTRELLA:  Counsel, we're not
22   arguing with the witness.  The witness did answer
23   the question several times.  You are --
24       MR. SAMMATARO:  You're completely misstating
25   the record.  He's not answered the question.  He's



Page 49

1    This case has a limitation of confidentiality
2    due to the settlement that was reached which may prevent
3    me from answering some questions.  I want to make that
4    clear.
5        Q    Did you testify at trial?  Yes or no?
6        A    The judge asked me several questions when I
7    was in the specialized room and I recall that I answered
8    her questions.
9        Q    Turning to the next Joel Bosh matter, the one
10   involving Maryangeli Burgos.
11       THE INTERPRETER:  Oh, sorry.  Go ahead.
12       MR. SAMMATARO:  No, no.  Go ahead.
13   BY MR. SAMMATARO:
14       Q    Yes or no, did you submit an expert witness
15   report in this case?
16       A    Yes, I submitted a witness expert report.
17       Q    And did you testify at trial in this case?
18   Yes or no?
19       A    No.  This case was settled before trials.  It
20   involved a prominent artist.  My understanding is that
21   the case was sealed.
22       Q    And were you qualified as an expert in this
23   case?
24       A    I wouldn't be able to tell you if the judge
25   qualified me as an expert.  I was hired by Joel Bosh as

Page 50

1    an expert.  I was not hired by the judge.
2        Q    Has there ever -- have you ever been
3    disqualified by any court to serve as an expert?
4        (Technical difficulties.)
5        MR. COBO-ESTRELLA:  Counsel, can you hear?
6    Did we get disconnected?
7        THE COURT REPORTER:  I think we lost the
8    interpreter.  There he is.
9        THE INTERPRETER:  Sorry.  I lost connection
10   for a second.
11       Can you repeat the --
12       THE WITNESS:  I have never been disqualified
13   neither in the national court nor in the federal
14   court.  By the opposite I have been called an
15   expert witness with high reputation in a case, I
16   don't recall how long ago, I believe against an
17   Hawaiian company.
18   BY MR. SAMMATARO:
19       Q    Let's go to the next Bosh case, the one
20   versus Coca-Cola.
21       Maybe we can just do this on a yes or no so
22   we can move this along.
23       Did you submit an expert report in this case?
24   Yes or no?
25       A    This case is sealed.  It involves a company

Page 51

1    like Coca-Cola.  There are many red flags that I
2    could -- I could not -- I could breach an agreement with
3    the court and even, in fact, my reputation if I disclose
4    some matters about this case.
5        Additionally an order was issued to delete
6    any content or any evidence pertaining this case.  I
7    would not like to render any statements that will affect
8    my reputation.
9        Q    Let's go to the next one, the Joel Bosh
10   versus T-Mobile case.  Did you do an expert report in
11   this case?  Yes or no?
12       A    The knowledge that I have is that I drafted a
13   report.  I am not sure if it was filed or not.  What I
14   know is that the case was settled on the (speaking
15   Spanish).
16       Q    Did you testify in deposition in this case?
17   Yes or no?
18       A    My recollection is that that was not the
19   case.  I only submitted an expert report.  I recall that
20   the evidence entailed many visual elements, many videos.
21       Q    Okay.  How about the fifth Joel Bosh case,
22   Joel Bosh versus Sony Music, did you submit an expert
23   report?  Yes or no?
24       A    Yes, a report was drafted for Joel Bosh and
25   the work had to be withdrawn from the market.

Page 52

1    Confidentiality was requested.  This case is now being
2    reopened.
3        Q    Which of the cases listed on pages 21, 22, 23
4    and 24 involved a copyright infringement action?
5        A    I would need to review each case one by one.
6    I don't have the documents with me.  What you are
7    portraying on the screen is not enough to make that
8    determination.
9        Q    This is your CV, correct?  You drafted it?
10       A    I would like to answer, but I cannot.  With
11   the information that is being portrayed on the screen is
12   not enough.
13       Q    What else would you need -- what else would
14   you need to see, sir, to remember if you served as an
15   expert witness in a copyright infringement action?
16       A    I would -- I want to answer, but we would
17   need to review the cases one by one.  Based on my
18   recollection, I can tell you there is one case with
19   copyright infringement and that is the Rene Lorente
20   versus Karol G.
21       MR. SAMMATARO:  Can you say that very last
22   part again?
23       THE WITNESS:  I want to answer --
24       THE INTERPRETER:  Sorry.  Give me one second.
25       THE WITNESS:  I want to answer but we would



Page 53

1   need to check each case one by one. Based on my
2   recollection I can tell you there is one case with
3   copyright infringement that is Karol G versus Rene
4   Lorente.
5          MR. SAMMATARO: I'm missing the very last
6   part. Karol G and what are you saying?
7          THE INTERPRETER: The other party is Rene
8   Lorente.
9          MR. COBO-ESTRELLA: Counsel, I'm not sure the
10  witness understood your question. I don't know if
11  you may want to try to rephrase it.
12         MR. SAMMATARO: Before we get there, again
13  every time you say the word, I'm literally getting
14  a glitch on the mic so I can't hear you.
15         THE INTERPRETER: Oh, I believe it is the
16  other party in the case Karol G versus Rene
17  Lorente.
18         MR. SAMMATARO: Okay. So this case. Okay.
19         THE WITNESS: It's the opposite. It's Rene
20  Lorente versus Karol G.
21         MR. SAMMATARO: Got it.
22  BY MR. SAMMATARO:
23     Q    So as you sit here today, without having any
24  additional materials in front of you, you can't recount
25  a single case that you served as an expert in a

Page 54

1   copyright infringement action aside from this case?
2       A    The thing is, I am not here to make
3   assumptions. You told me that you had enough time,
4   several days. I have no issues on starting one by one
5   and telling you if they have a copyright infringement or
6   not.
7       Q    Sir, if the court was to ask you how are you
8   qualified to serve as an expert in a copyright
9   infringement case, which case would you point to?
10      A    I don't have to answer this question. This
11  is an assumption. The attorney is guiding me to answer
12  something that it's based on an assumption and I'm not
13  here to answer based on assumptions.
14      Q    Sir, your whole job as an expert witness is
15  to answer hypotheticals. If you're not going to answer
16  the question just say so on the record so I can move to
17  the court because you're being evasive, dodgey and
18  unprofessional and you're wasting my time and you're
19  going to -- ultimately wasting the court's time. So if
20  you want to keep going, we're going to move for
21  sanctions.
22         It's really simple. If you do not understand
23  or you do not know, just say so, but do not waste our
24  time.
25         MR. SAMMATARO: I'm not paying for this.

Page 55

1   Humberto, I want to be clear. I'm not paying for
2   evasive testimony. We are moving the court for
3   sanctions.
4          MR. COBO-ESTRELLA: Counsel, may I
5   respond as --
6          MR. SAMMATARO: You should respond by
7   instructing your witness to honor his obligations
8   as an officer of the court. That's how you should
9   respond, but go ahead, please respond. Please
10  waste more time, please.
11         MR. COBO-ESTRELLA: Before you started on
12  this line, I -- I made a comment to you precisely
13  that I believe the witness may not have understood
14  your question.
15         Remember, there's an interpreter here trying
16  to go back and forth and I don't know if something
17  might have been lost in that translation. That's
18  why --
19         MR. SAMMATARO: Clearly he understood because
20  he rephrased the question. He clearly understood.
21  So I wholeheartedly reject that. I wholeheartedly
22  reject this evasive, unprofessional conduct.
23         This is not accepted in the Southern District
24  of Florida. This is sanctionable and why don't we
25  just keep going.

Page 56

1          So you -- if you want to instruct your
2   witness to play these games, we'll play these
3   games. We'll --
4          MR. COBO-ESTRELLA: Counsel, for the record,
5   I'm not instructing the witness to play any games.
6   So I want to be clear on that.
7          MR. SAMMATARO: Why don't you instruct him to
8   answer questions.
9          MR. COBO-ESTRELLA: I'm stating there was
10  something perhaps in the interpretation that might
11  have been lost in some of your questions and that's
12  why I asked if you could repeat one of your
13  questions or rephrase it because I was under the
14  impression the witness might not have understood, I
15  think the second to last question you had, and the
16  witness might have lost something in the
17  translation.
18         If you could perhaps rephrase or repeat the
19  question and have the interpreter do it, maybe the
20  witness will understand your question.
21         MR. SAMMATARO: If it was just one question,
22  I would buy that. It's every question.
23  BY MR. SAMMATARO:
24      Q    Okay. I'll ask the question again. I'll ask
25  the question again.



Page 57

1     MR. COBO-ESTRELLA:  I'll instruct the
2  witness, please pay attention and try to respond to
3  the opposing counsel's question as truthful as
4  possible, please.
5     MR. SAMMATARO:  There's no question pending
6  right now.  You shouldn't be talking.  There's no
7  question.
8     MR. COBO-ESTRELLA:  (Inaudible.)
9     MR. SAMMATARO:  There's no question.  Put
10  your hand down, there's no question.  I'm going to
11  re-ask the question pursuant to your counsel's
12  request.
13     THE WITNESS:  (Speaking Spanish.)
14     MR. SAMMATARO:  I'm about to end this
15  deposition.  I'm about to end this deposition.
16  Keep talking.  Keep talking.  Keep talking.
17     MR. COBO-ESTRELLA:  Counsel, have the
18  interpreter explain to him what I was stating for
19  the record.  I don't think he may have understand
20  my statement either.  So I'm -- I'm asking --
21     MR. SAMMATARO:  I will have the interpreter
22  rephrase it.  I do not want to hear from Mr. Viera.
23  I do not want more filibusting.
24     So, Santiago --
25     MR. COBO-ESTRELLA:  I'm telling Mr. Viera not

Page 58

1  to respond and not to respond -- if there's no
2  question, not to respond.  Please have the
3  interpreter phrase this to the --
4     Thank you.
5     THE INTERPRETER:  He's asking just to state
6  your questions, say it with respect.
7  BY MR. SAMMATARO:
8     Q    I'm trying to be respectful, sir.  I would
9  ask for you to be respectful.
10     If the court were to ask you what prior cases
11  have you testified as an expert involving copyright
12  infringement, which of these cases would you point to?
13     A    The thing is, the court is not asking me any
14  questions today.  So with all due respect, this is an
15  assumption and with all due respect, I do not answer
16  under assumptions.
17     Q    You understand, sir, as an expert witness
18  you're obligated to answer hypothetical questions?
19     A    Questions, but not assumptions.
20     MR. COBO-ESTRELLA:  Counsel Sammataro, I want
21  to try to re -- because I need the witness to
22  respond to your questions.  Again, I don't think he
23  understands.  I want to be clear, if I understand
24  when you're asking, if one of things -- may I --
25  may I rephrase your question and you can tell me if

Page 59

1  this is what you're asking and have the interpreter
2  explain?
3     Are you asking him to the testify what other
4  cases he testified as an -- as a copyright expert
5  witness?  Is that what your question is, Counsel?
6     MR. SAMMATARO:  All I want him to answer, for
7  the love of God and for the brevity of life, is for
8  the 23 cases that he has listed on pages 21
9  through 24 of his report, which of those cases did
10  he testify as an expert witness in a copyright
11  infringement action.
12     MR. COBO-ESTRELLA:  It's a simple question,
13  Counsel, we understand.  Please have the
14  interpreter explain that to the witness so he may
15  respond.
16     THE WITNESS:  I would answer the court
17  immediately.  I would go one by one and I would
18  tell them in which cases.
19  BY MR. SAMMATARO:
20     Q    But you're not prepared to go one by one
21  right now?
22     A    Yes.  Since the beginning I told you that we
23  can do that.  We can go one by one.
24     Q    Just all I want you to do, sir, is go by one
25  by one and si or no, if it was a copyright case.

Page 60

1  don't need an explanation about the case.  I don't need
2  some alleged story about the case was sealed.
3     Just yes or no, was it a copyright
4  infringement case?  Let's go one by one.
5     A    You're being sarcastic when you talk about
6  how I convey information.  I will ignore that and I will
7  answer to you going one by one.
8     Q    Go ahead.  We'll go to the very top, page 21.
9     Yes or no, was Joel Bosh versus Banco Popular
10  a copyright infringement case?
11     A    Yes, it involved copyright infringement.
12     Q    Joel Bosh versus Maryangeli Burgos, is that a
13  copyright infringement case?  Yes or no?
14     A    Yes, and others.
15     Q    Okay.  What do you mean "and others"?
16     A    I believe that case also involved
17  trademark -- copyright and trademark.
18     Q    Okay.  The third Joel Bosh case, Joel Bosh
19  versus Coca-Cola, was that a copyright infringement
20  case?  Yes or no?
21     A    Yes, correct.
22     Q    Okay.  The fourth case, Joel Bosh versus
23  T-Mobile, is that a copyright infringement case?  Yes or
24  no?
25     A    Yes, correct.



Page 69

1 undergoing negotiations.
2    Q   For Peer Music?
3      THE INTERPRETER: Sorry?
4 BY MR. SAMMATARO:
5    Q   So Peer Music has paid you for your services?
6    A   So far Peer Music has not paid me. They have
7 retained my services and we are currently under
8 negotiations for representation.
9    Q   So when you listed them on your CV as having
10 been representative of past work, you actually haven't
11 done any work to date for Peer Music?
12    A   I have paid thousands of dollars to them for
13 music. The services that I have provided for them have
14 been free, but as I told you, they are currently -- we
15 are currently under negotiations for hiring me as a
16 representative for Peer in Puerto Rico.
17      MR. SAMMATARO: Why don't we take a
18 five-minute break to give everyone a little bit of
19 a chance to reset and we'll come back at it.
20      MR. COBO-ESTRELLA: Counsel, are we off the
21 record?
22      THE VIDEOGRAPHER: One moment, please.
23      Going off the record. The time is 12:09.
24      (A recess was taken.)
25      THE VIDEOGRAPHER: We are back on the record.

Page 70

1      The time is 12:15.
2 BY MR. SAMMATARO:
3    Q   Mr. Viera, I want to go back to your CV. And
4 I specifically want to go to pages four and five and on
5 pages four and five you list your education. Why don't
6 we just scroll through that.
7      Is your complete formal education contained
8 on your CV?
9    A   Yes, and 45 years of experience on the field
10 which is the most important thing in a person's life.
11    Q   On page one of your CV, when you're
12 listing where you're listing -- well, there's a list and
13 on the second line it says "Expert in damages cases in
14 the entertainment industry."
15      Do you see that?
16    A   Yes, I can see that.
17    Q   You're not an economist, correct?
18    A   Economist, I have never wanted to be an
19 economist. I have never missed that.
20    Q   So, no, the answer's no, correct?
21    A   Math is universal. One plus one is two.
22    Q   Do you hold any degrees in accounting? Yes
23 or no?
24    A   45 years on the field.
25    Q   Sir, my question is simple. Yes or no, do

Page 71

1 you have a degree in accounting?
2      If you can't answer these simple questions,
3 just let me know and we'll ask the court to sit in on
4 the next deposition.
5    A   In accounting, no. I've never needed it.
6    Q   And do you hold any degrees in finance? Yes
7 or no?
8    A   I have never needed it.
9    Q   So is that a no?
10    A   I have never needed it. I am on the field of
11 entertainment.
12    Q   Let's put on the screen what I'll mark as D4.
13      (Defendant's Exhibit 4 was marked for
14 identification.)
15 BY MR. SAMMATARO:
16    Q   Which, for the record, is the amended expert
17 report dated March 3rd of 2025.
18      THE INTERPRETER: Can you repeat the date?
19      Sorry.
20      MR. SAMMATARO: March 3, 2025.
21 BY MR. SAMMATARO:
22    Q   Sir, did you draft this report?
23    A   That is correct.
24    Q   Did anyone assist you in drafting the report?
25    A   It is signed by me. My reports are drafted

Page 72

1 by me. It has my signature.
2    Q   Okay. Again, my question, very simple. Did
3 anyone assist you in drafting the report? Yes or no?
4    A   It is my report. I drafted it. It is
5 sustained by my signature.
6    Q   Turn to page 13 of your report. On page 13
7 of your report, you indicate that Mr. Lorente-Garcia is
8 regarded as "a virtuoso flute performer."
9      What is the basis of that opinion?
10    A   I know the career of the -- as a
11 musicologist, I know the career of the Arcaño orchestra,
12 Antonio Arcaño under marble for the Sacred Hearts.
13      Before knowing Rene Lorente personally, I
14 knew he was -- he was the most prominent student of
15 Antonio Arcaño, Jose Barbosa, and the alternate of
16 re-chart in the orchestra.
17      He is a performer of the transverse flute.
18 It's a 17th century flute, that it has five keys. This
19 flute has not been manufactured for over a hundred years
20 and he's preferred perhaps the only musical performer
21 using that transversing flute.
22    Q   On page 16 of your affirmative report, very
23 top, you state, "The composition titled Algo Diferente
24 was created with 100 percent originality by the artist,
25 musician, composer and arranger Rene Lorente in 1998.



Page 73

1    Do you see that?
2    A    Yes, correct.
3    Q    Within the context of copyright law, what do
4    understand the term "original" to mean?
5    A    It's its own creation.  It's a creation of a
6    composition that starts in a tangible mean.  This is an
7    original composition under his muse, created by his
8    muse, under his muse.
9    Q    Do you think it's appropriate for a
10   musicologist to opine on whether a musical work is
11   original?
12   A    I believe, yes, as part of the activities
13   performed by a musicologist, he or she can decide, each
14   has his or her own criteria and uses his or her own
15   criteria.
16   Q    When you say that Algo Diferente is a hundred
17   percent original, you weren't with Mr. Lorente-Garcia
18   when he composed Algo Diferente, were you?
19   A    I was not with him.  I didn't need to be with
20   him to determine if the song was original or not.
21   Q    Okay.  Do you know what the term "prior art"
22   means?
23   A    Yes, I am familiar.
24   Q    What do you understand the term "prior art"
25   to mean?

Page 74

1    A    It has many connotations.  I believe it's the
2    upset -- what it can be used to upset other parts in
3    works that are -- that allegedly exist or are similar
4    from a song that's in the public domain or that it's
5    under.
6         Basically it's a defense mechanism --
7         THE INTERPRETER:  Give me one second, please.
8         THE WITNESS:  Basically it is a defense
9    mechanism, but it's something as we say in Puerto
10   Rico "farfetched."
11   BY MS. SAMMATARO:
12   Q    Prior art is farfetched?
13   A    Yes.  I'm saying that this pertains to the
14   last line.  It needs to be read fully, and I said that
15   it is sometimes used as a legal subterfuge.  It needs to
16   be fully read.
17   Q    In forming your opinion that Algo Diferente
18   is 100 percent original, you did not conduct a prior art
19   search, correct?
20   A    I know when a work is original because of my
21   experience.  And the work that I was hired to do was to
22   prove the case, not to conduct a search on other topics
23   or anything that could damage.  My job is to study the
24   work and draft a report of my findings and this is
25   100 percent original.

Page 75

1    Q    How can opine a work is a hundred percent
2    original without conducting a prior art search?
3    A    I was not hired to conduct a search because
4    previous art is often used as a weapon to attack.  I
5    recognize that it was a hundred percent original and if
6    I am confident of that, it is enough for me.
7    Q    How can you determine if something's a
8    hundred percent original without considering whether
9    there are preexisting works that contain the same
10   musical elements?
11   A    I use my instinct.  I use what I have here
12   when I can't smell it.  I use my ears.  I am able to
13   detect when a word is copied, when there is any sort of
14   copy.  I operate at that high level.
15   Q    Are you aware of every song that was ever
16   created in the history of man?
17        MR. COBO-ESTRELLA:  Objection, for the
18   record.  Ambiguous.  Vague.  Overbroad.
19        Go ahead.
20   BY MR. SAMMATARO:
21   Q    You can answer.
22   A    I don't think that is a serious question,
23   with all due respect.
24   Q    I don't think your last answer was serious,
25   with all due respect.

Page 76

1         How can you determine whether something is
2    original unless you search for preexisting art?
3    A    You may believe my answers or you may not,
4    but I hold an instinct, something that was granted to me
5    by God.  I have a unique perception, something that
6    perhaps very few people in the music industry have.
7    Q    Do you agree that consideration of prior art
8    is essential to any musicological analysis that compares
9    the alleged similarities between two works?
10   A    I was hired to do something very simple.  I
11   reviewed the case and I was simply comparing Algo
12   Diferente versus Don't Be Shy.
13   Q    Is it your opinion that in comparing Algo
14   Diferente to Don't Be Shy you do not need to distinguish
15   between the protected and the unprotected elements
16   contained in Algo Diferente?
17   A    I first determined if it is an original work.
18   Once I have determined that it's an original work and I
19   am confident of that, I check the copy, the plagiarized
20   work, the still.  I check the original work is
21   protected.  If it's copyrighted with the copyright
22   office in Washington and then I check the copy.
23   Q    Would it be fair to say that in comparing
24   Algo Diferente to Don't Be Shy, you did not perform a
25   filtration process distinguishing between the protected



Page 109

1    is my deposition and I'm allowed to ask questions
2    that test his expert knowledge.  This is a fair
3    question.
4        If he's unwilling to answer it, I will move
5    on and note that there's other notes I would want
6    him to identify, but I think it's wildly
7    inappropriate for him not to answer a question
8    based on --
9        MR. COBO-ESTRELLA:  He answered the question.
10   He did answer partially your question.  I think
11   perhaps -- maybe you should -- you should ask him
12   or rephrase the question.
13       I don't think he's refusing to answer, but
14   he's saying, you know, from what I understand he
15   already identified several notes.  He's not going
16   to identify every -- at least that's what he stated
17   because it's part of a --
18       MR. SAMMATARO:  Okay.  Just so the record's
19   very clear -- Santiago, please translate this word
20   for word.
21   BY MR. SAMMATARO:
22       Q    In the first highlighted box, you've
23   identified F and G.
24       Are those the only notes that you're willing
25   to identify on the record?

Page 110

1        A    I can see two, three, four, five segments of
2    a staff.  It looks like a piano's chord.  It's not
3    clear.  It shows treble and bass clefts.  Playing the
4    piano is like speaking two languages at one.  Right hand
5    the treble cleft and left hand the bass left.  The
6    performer has -- the performer has to read both
7    simultaneously.  That is not part of the skills.
8        Q    So far you've identified F and G.  Are those
9    the only notes that you're willing to identify by
10   letter?
11       A    That is correct.  I have identified that
12   these music sheets belong to a piano score.  It's just a
13   fragment.  That's all.
14       Q    Do you know if this five note rhythm that is
15   in the first highlighted red box is present in Algo
16   Diferente?
17       A    That would be the opinion of the person that
18   did this, the interpretation of the person who did this,
19   not mine.
20       Q    As transcribed by this person, is this five
21   note transcription present in Algo Diferente?
22       A    I do not see any comparison here.  This is a
23   staff.  I'm not sure of the number, but it's labeled
24   with the letter B in treble cleft.
25       In the next box, there are a few notes and

Page 111

1    there's a red box highlighting two notes in red.  Algo
2    Diferente starts with a half rest and D.
3        Q    Okay.  So let's go to page 28 of your
4    affirmative report previously marked as D4.  This is
5    your transcription of Algo Diferente, correct?
6        A    This is the arrangement by Rene Lorente.
7        Q    Okay.  Did you transcribe this or was this
8    provided to you?
9        A    Yes.  This is music sheet by Rene Lorente.
10   It has eight bars and that was provided to me by Rene
11   Lorente just like all the other things in this case.
12       Q    Okay.  Did you independently verify whether
13   the transcription in Algo Diferente as provided to you
14   is correct?
15       A    Yes, that is correct.
16       Q    Okay.  And the five note rhythm that I showed
17   you in Mamblues, is that present in the transcription of
18   Algo Diferente that's currently on the screen?
19       A    I couldn't tell you, because I didn't analyze
20   those two music sheets.  My analysis was limited to Algo
21   Diferente and Don't Be Shy.
22       Q    Okay.  So if I provided you with other music
23   sheets of other songs and asked you to identify whether
24   the five note rhythm in the sheet music was present in
25   Algo Diferente, you couldn't tell me?

Page 112

1        A    It would imply from that a live analysis of
2    music sheets presented to me relative to Algo Diferente
3    and the answer would be no.
4        MR. SAMMATARO:  You mind repeating that.  I
5    missed a little bit.
6        THE INTERPRETER:  Sure.
7        THE WITNESS:  It would imply on that a live
8    analysis of music sheets presented to me relative
9    to Algo Diferente and the answer would be no.
10       MR. SAMMATARO:  I think I'm missing the very
11   end what you're saying.
12       THE INTERPRETER:  And the answer would be no.
13       MS. SAMMATARO:  Okay.  Well, why don't we
14   just close the loop here.  What I'll mark here as
15   Exhibit D10.  Okay.
16       (Defendant's Exhibit 10 was marked for
17   identification.)
18   BY MR. SAMMATARO:
19       Q    Mr. Viera, I'm going to represent to you what
20   is on the screen, as you can see from the top, is sheet
21   music from a work called Astras De Nos.
22       Are you familiar with this work?
23       MR. COBO-ESTRELLA:  Counsel, again, same
24   objection as before.  This is not part of the
25   witness report.  We would have an objection.



Page 113

1    Please note it for the record.
2         MR. SAMMATARO:  Noted.
3    BY MR. SAMMATARO:
4    Q    You'll see, Mr. Viera, on the very top on the
5    second staff, there's again a red highlighted box.
6         Are you able to identify the notes in this
7    highlighted box?
8    A    I have not seen these music sheets before.
9    It is irrelevant.  Analyzing it would be a live
10   interpretation and it's not my role.  I didn't analyze
11   this piece in relation to anything else.
12   Q    Okay.  Are you unable to analyze and identify
13   the notes as you sit here today?
14   A    I could, but it's irrelevant.  My answer for
15   the comparison would be no.
16   Q    Okay.  Sir, relevance is not an objection.
17   That's sus -- that is sustainable.  So I understand your
18   view of it's not relevant.  You're not allowing me to
19   get why it's relevant.  So if you're going to refuse to
20   answer the question based on relevance, I just need you
21   to do so on the record.
22   A    I stated this twice.  My answer is no.
23   Q    No.  That you're unable to trans -- to read
24   what the notes are?
25   A    I can do a transcription.  I would need to

Page 114

1    have the sheet music, listen to it and see what's there,
2    but that is not my role, so I cannot do that at this
3    moment.
4    Q    Okay.  I'll take that as a response.  Thank
5    you.
6         Let's go back to your affirmative report on
7    page 28.  On page 28, you see that the transcription
8    that appears contains -- or includes all 16 measures,
9    correct?
10   A    Correct.
11   Q    And turning now to page 24 of your
12   affirmative report, here at the very top this
13   transcription only contains eight measures, correct?
14   A    Yes, they provided two to me, one with 16
15   measures and the other one with eight measures.
16   Q    Okay.  And, again, this transcription was
17   provided to you, you didn't -- you didn't transcribe it
18   yourself?
19   A    Yes, that is correct.  As I previously
20   stated, it was provided to me by Rene Lorente and I
21   reviewed it.
22   Q    Okay.  And how about the transcription of
23   Don't Be Shy that's right below Algo Diferente, did you
24   transcribe this?
25   A    It was provided to me as well, as I

Page 115

1    previously stated, as part of all the material for the
2    case by Rene Lorente.
3    Q    Okay.  Do you know why Mr. Lorente-Garcia
4    omitted measures nine through 16 in the transcription
5    contained on page 24?
6    A    Well, the plagiarism is in the eight bars.
7    He doesn't need anything else because it's at the heart
8    of the song.
9    Q    Okay.  Let's turn to page 25 of your
10   affirmative report.
11        Was this transcription also -- is the
12   transcription of Algo -- strike that.
13        Was the transcription of Algo Diferente also
14   provided to you by the plaintiff?
15   A    Yes, that is correct.
16   Q    Okay.  And how about the transcription of
17   Don't Be Shy on the bottom of page 25, was that also
18   provided to you by the plaintiff?
19   A    Correct.
20   Q    Okay.  And just to close the loop, now
21   turning to page 26 of your report, at the very top of
22   page 26, is the transcription of Algo Diferente that
23   appears on page 26, was that also provided to you by the
24   plaintiff?
25   A    That is correct.

Page 116

1    Q    And then the transcription of Don't Be Shy on
2    page 26, was that also provided to you by the plaintiff?
3    A    Correct.
4    Q    Okay.  Let's turn to -- as a general matter,
5    what damages is a copyright owner entitled to recover in
6    the event that he proves infringement?
7         MR. COBO-ESTRELLA:  Counsel, I'm object to
8    the question if it asks for a legal opinion.
9         MR. SAMMATARO:  He -- he's opined as to
10   damages as a copyright expert.  So I'm asking him
11   what damages he believes that a plaintiff is
12   entitled to.
13        THE WITNESS:  The damages that have been
14   caused -- caused, yeah.
15        MR. SAMMATARO:  Can you repeat that,
16   Santiago?
17        THE WITNESS:  The damages that have been
18   caused.
19   BY MS. SAMMATARO:
20   Q    By legally -- let's take a step back.  Why
21   don't we put on the screen what I'll mark as D11 which
22   is --
23        (Defendant's Exhibit 11 was marked for
24        identification.)
25   BY MR. SAMMATARO:



Page 121

1  Q   Okay.  Mr. Viera, before we took a break, I
2  asked you if your damages calculations was premised on
3  the assumption that the units that were certified as
4  sold, as stated in your report, constituted physical
5  sales and digital downloads and you indicated that you
6  need to see your report.  So your report is now on the
7  screen.  We're happy to scroll up and down as necessary.
8  A   Yes.  This is based on the single which are
9  digital sales.
10  Q   Okay.  And then correspondingly for the album
11  Drive, your damages calculation is premised on the
12  assumption that 580,000 units of Drive were sold,
13  correct?
14  A   Correct.
15  Q   And just to make sure we're saying the same
16  thing, you believe that 580,000 units of Drive that were
17  certified as sold were either physical sales or digital
18  downloads, correct?
19  A   I would like to check what the report says
20  about Drive.  I believe that all the parts relate to
21  single.
22  Q   Let's turn to page 53.  And if you see at the
23  very top it says, "Tiesto sold" -- well, second sentence
24  says, "The best selling album by Tiesto is Drive which
25  sold over 580,000 copies."

Page 122

1      Do you see that?
2  A   Yes, that is in the USA and I was extremely
3  conservative because the album has exceeded 2 million
4  sales.
5  Q   And do you dispute that the units certified
6  by the RIAA also include streams?
7  A   Also physical and digital.
8  Q   Right.  But if, for example, the
9  500,000 units that were certified for the single Don't
10  Be Shy also included streams, would that impact your
11  damages calculation?
12  A   It's the same whether it's streams or
13  physical.  When you buy the album, you buy it physically
14  and it's not longer -- this is the album.
15  Q   Is it your understanding that the RIAA
16  contemplates a number of streams equals the sale of one
17  album -- strike that.  Let me ask the question
18  differently.
19      Are you aware under the RIAA that a certain
20  number of streams constitutes the sale of one album?
21  A   Yes, it is what I just mentioned.  For
22  example, when you buy the album, you buy the full
23  content, in this case, Drive, which is the name of the
24  album.
25  Q   What if I don't buy the album but I -- but I

Page 123

1  stream Don't Be Shy a hundred thousand times, what does
2  that constitute in terms of RIAA units sold, measures?
3      THE INTERPRETER:  You said a hundred
4  thousand?
5      MR. SAMMATARO:  Correct.
6      THE WITNESS:  Well, it would be an
7  assumption, but the RIAA certifies rights, it
8  certifies the album.
9  BY MR. SAMMATARO:
10  Q   Okay.  So you're not aware of there being any
11  metrics of X number of streams equals one album sale?
12  A   That could be a metric, but the certification
13  is for the single Don't Be Shy and for the album Drive.
14  Q   You reviewed Barry Massarsky's expert report,
15  correct?
16  A   Yes, correct.
17  Q   Okay.  I'm going to put on the screen what
18  I'll mark as D12.
19      (Defendant's Exhibit 12 was marked for
20  identification.)
21  BY MS. SAMMATARO:
22  Q   And I want to turn your attention to
23  paragraph 23 of Mr. Massarsky's report.  And you'll see
24  in paragraph 23 of Mr. Massarsky's report, in the first
25  sentence he says, "I used Luminate, the industry

Page 124

1  standard provider of accurate sales and streaming data,
2  to pull the streaming and sales activity of the album
3  Drive."
4      Do you see that?
5  A   Yes, I can see it clearly.
6  Q   And then the next sentence Mr. Massarsky
7  says, "From inception through March 2, 2025, the album's
8  total physical and digital sales were 6,886 units in the
9  United States."
10      Do you see that?
11      So according to Mr. Massarsky Drive sold
12  573,000 fewer units than you have opined in your expert
13  report.
14      Do you dispute Mr. Massarsky's finding in
15  paragraph 23?
16  A   Absolutely, he is wrong.
17  Q   Okay.  And do you dispute that Luminate data
18  is accurate or the industry standard?
19  A   I am not a big follower of Luminate.  This is
20  a company owned by Billboard and they are mainly used to
21  manage the chart and as a request of everything that the
22  Billboard might have seen that.
23  Q   So -- okay.  Let's turn to page -- well,
24  paragraph 27 -- I'm sorry -- paragraph 27, page nine of
25  Mr. Massarsky's report.



Page 125

1    You'll see in paragraph 27, Mr. Massarsky
2    says that "Based on Luminate data, there are only 25,801
3    singles of Don't Be Shy sold in the United States
4    through March 2nd of 2025."
5        Do you dispute Mr. Massarsky's conclusion
6    that only 25,801 singles as opposed to 500,000 singles
7    of Don't Be Shy were sold in the United States?
8    A    This is absolutely wrong.  And it's not
9    related to RIAA figures considering that this is the
10   highest authority to calculate royalties and there are
11   other things and this is also unrelated to the award
12   that's ASCAP granted in London to Temo Luag (phonetic).
13   Q    Let's go to -- back to your affirmative
14   report and specifically on page 51.  Right there.
15       So on page 51 of your report under
16   "Publishing," you multiplied the 500,000 units sold for
17   Don't Be Shy times .12 cents -- times 12 cents, .12
18   cents.
19       Do you see that?
20   A    Correct.
21   Q    Where did you get the 12 cent amount from?
22   A    This is based on the statute rate under the
23   carpeta.
24   Q    Do you know if the defendants actually
25   receive 12 cents for every unit sold?

Page 126

1    A    It is the certification.
2    Q    No.  My question is, did you know if the
3    defendants actually received 12 cents for every unit
4    sold?
5    A    I am not aware of that.  I did not receive
6    the royalty statements of any of these five composers.
7    Q    And under master, which you then say
8    parenthetically 7.99, there's 500,000 times $1.
9        Where did you get the $1 figure from?
10   A    It is an estimate based on a standard on the
11   price of a song when you buy it.  It ranges between 99
12   cents, $1.10 and 1.29.  That is what a song may cost to
13   you whenever you buy it.
14   Q    Okay.  So in this calculation of 500,000
15   times $1, that is your calculation based on 500
16   purchases of the single Don't Be Shy?
17   A    This is my estimate.  It will be higher, but
18   I always stick to be considerate and more accurate.
19   Q    Okay.  And I believe you indicate that you do
20   not rely upon the numbers that Mr. Massarsky does
21   because Luminate data you do not trust, correct?
22   A    I have never omitted the RIAA certifications.
23   This could be -- the figures that the percent would be a
24   closure of additional sales, but it was said to leave
25   out the certification by the RIAA.

Page 127

1    Q    And, again, just to be clear, you're not
2    familiar that the RIAA treats 1,500 streams as the
3    equivalent of one album sale, correct?
4    A    I am familiar with that, but the
5    certification is very clear.  It refers to the Don't Be
6    Shy single and to the Drive album and it has a date and
7    a year.
8    Q    So let's go to page 50 of your report and
9    make sure we're saying the same thing.
10       If we look -- looking at page 50, we have the
11   title Don't Be Shy and it says certified units .5
12   million.  You see that?
13   A    Correct.
14   Q    And you're interpreting this RIA [sic]
15   certification to mean that 500,000 copies of Don't Be
16   Shy were purchased?
17   A    It is what the certification states, not my
18   suggestion.
19   Q    Okay.  And are you aware that the RIAA
20   certification uses what the industry calls album
21   equivalent units?
22   A    Correct.  In this case, we're talking about a
23   single.
24   Q    Okay.  I understand.
25       So let's go to page 57 of your report --

Page 128

1    actually 58.  So on page 58, this is actually in
2    reference to Tiesto's album Drive, correct?
3    A    Correct.
4    Q    And this is -- this is the source for your
5    belief that more than 500,000 units of Drive were
6    purchased, correct?
7    A    Three years ago, this is the certification
8    issued by RIAA.
9    Q    Correct.
10       And this is the certification that you're
11   relying upon for the conclusion that over 500,000 units
12   of the album Drive were purchased?
13   A    That is clear.  You can see in the report
14   where it says, side, you can see that standard is next
15   to it.
16   Q    So let's go to page 59 of your report and you
17   see there's a line that says "Publishing," 580,000 times
18   12 cents, what does that formula represent?
19   A    This is the formula for publishing the
20   royalties owed to Rene Lorente for his original song
21   Algo Diferente adding up to $69,600.
22   Q    Okay.
23   A    And for masters at a rate of $1 per unit, it
24   adds up to $580,000.
25   Q    And, again, that $1, that's your estimate,



Page 129

1  correct?

2      A    It is a dollar that I estimated.  It could be

3  higher, but this is quite a conservative estimation.

4      Q    But you don't actually know if the defendants

5  actually received a dollar, correct?

6      A    They must have received way more because the

7  defendants here are not limited to the composers.  The

8  defendants also include the record labels and others.

9      Q    As you sit here today under oath, do you know

10  the actual gross revenues that the defendants received

11  from the physical and digital sales of the single Don't

12  Be Shy?

13      A    I have not received any royalty statement or

14  any documents from the record labels for this case.  At

15  the moment, they will need to open the books.

16      Q    So until the books are open, you don't know

17  the actual gross revenues actually received by the

18  defendants from the physical and digital sales of the

19  single Don't Be Shy, correct?

20      A    That is correct.

21      Q    And same thing, as you sit here today, you

22  don't know the actual gross revenues that the defendants

23  received from the physical and digital sales of the

24  album Drive, correct?

25      A    As for any certification that could have been

Page 130

1  issued by the record label, it is my understanding that

2  currently they have not provided any such documents.

3      Q    I think at one point when I was asking you

4  about your sources to verify the number of units sold,

5  you referenced ASCAP; is that correct?

6      A    I would need to refer to that part of the

7  document to make sure that I can answer accurately on

8  any questions.

9      Q    Okay.  Let me ask the question differently.

10  Have you relied upon any ASCAP information for the

11  purposes of calculating damages?

12      A    There is a certification provided by ASCAP on

13  the award that they granted and the certification of

14  these performing rights organization is publicly

15  available.

16      Q    Okay.  Do you believe ASCAP certifies record

17  sales?

18      A    ASCAP based royalties -- performance

19  royalties for everything that gets played publicly.

20  That includes licensing income from radio stations, TV

21  stations and similar venues.

22      Q    Okay.  But ASCAP doesn't have anything to do

23  with records sold?

24      A    Yes, it is not a company that sells records.

25  It is not a record company.  It's a performance

Page 131

1  company -- performing rights company.

2      Q    Let's turn to print -- turn to page 68 of

3  your report and on page 68 of your report, you indicate

4  that as of the date of this report -- or actually as of

5  March 26, 2025, that there had been 748,348,286 streams

6  of Don't Be Shy, correct?

7      A    Yes, that is correct.  It was the figures

8  certified by Spotify as you can see on the screen.

9      Q    And does this $748 million -- 748 million

10  stream number contemplate global streams or just US

11  streams?

12      A    This number of streams is limited to the

13  platform Spotify.  There are many other platforms but

14  this is limited to Spotify.  There are plenty other

15  platforms, but this the main one.

16      Q    Okay.  But of the 748 million Spotify

17  streams, you do not know how many of those streams are

18  from the United States, correct?

19      A    Exactly.  Not the US nor any other country.

20  Only based on what Spotify certifies.

21      Q    Is it your understanding that a copyright

22  plaintiff suing the United States can recover for global

23  streams?

24          MR. COBO-ESTRELLA:  Counsel, again, if you're

25  asking for a legal opinion, I will object.  Please

Page 132

1  note that.

2          MR. SAMMATARO:  Objection noted.  Just trying

3  to understand his calculation of damages.

4  BY MR. SAMMATARO:

5      Q    You can answer.

6      A    This depends on the weight the jury gives to

7  the evidence.  That's up to them.  I only provide a

8  report.  It's up to the attorneys to prove the case and

9  the jury to decide.

10      Q    Okay.  So you believe that a US -- that a

11  plaintiff suing in the United States can recover damages

12  earned from foreign streams?

13      A    I have a good instinct for these cases and

14  the production owners are here in the United States.

15  The decision of whether or not granting a license is

16  made in the United States.  The infringement is made in

17  the United States.

18      Q    But if the publisher is located in a foreign

19  country and the foreign publisher approves the license,

20  does the infringement still occur in the United States?

21      A    That would be an assumption, but what I saw

22  is that all of them, including the publishing company,

23  which is the one in charge of licenses and the record

24  label, are in the US.

25      Q    The five percent -- I'm sorry.  The .05



Page 133

1  number that you use as the rate for stream, what is that
2  number based on?
3      A    Well, even the certifications -- in fact, the
4  certifications for those who have filed with the
5  copyright office or with collective rights organizations
6  are all from US companies.  The .05 cents is a payment
7  from Spotify per stream.  That is the formula that
8  Spotify uses.
9      Q    Let's turn to page 80 of your expert report
10  and this is your damages calculation, correct?
11     A    Correct.
12     Q    And under "Actual Damages" at the top of the
13  page, you state that the plaintiff has suffered a loss
14  of income in the amount of $2 million.
15         How has the plaintiff lost $2 million in
16  income from Don't Be Shy?
17     A    It is the income that he lost as the owner of
18  the song affected by this copyright infringement because
19  he did not receive anything of it.
20     Q    Is this income -- is this $2 million of
21  income that plaintiff would have received had Don't Be
22  Shy not been released?
23     A    This income would have been higher if a
24  license had been requested.
25     Q    Okay.  So this is the revenue that the

Page 134

1  plaintiff lost because Don't Be Shy did not seek a
2  license to use Algo Diferente, correct?
3      A    I didn't say that.
4      Q    Okay.  How much money did the plaintiff earn
5  from Algo Diferente between 1998 and 2021?
6          THE INTERPRETER:  I'm sorry.  Until what
7  date?
8          MR. SAMMATARO:  Between 1998 and 2021.
9          THE WITNESS:  I am unaware of this figure
10  because the royalty statement by the record label
11  and by the performing rights organization, it's
12  submitted directly to Mr. Lorente and its described
13  document.
14  BY MR. SAMMATARO:
15     Q    You didn't ask Mr. Lorente-Garcia how much
16  money he earned from Algo Diferente between 1998 and
17  2021?
18     A    No, because that to me is irrelevant because
19  Rene did not plagiarize his song.
20     Q    Wouldn't the amount of income that the
21  plaintiff actually earned from Algo Diferente be the
22  best measure of the income that he purportedly lost?
23     A    No.  That is like having a Toyota or a
24  Porsche.  Both cars have four wheels and the same -- and
25  an engine.  It is like flying first class or coach.  The

Page 135

1  airplane would reach its destination regardless of where
2  you're sitting.
3      Q    So if Mr. Lorente-Garcia only earned $20,000
4  from Algo Diferente in the two decades prior to the
5  release of Don't Be Shy, in your opinion, that's
6  irrelevant to calculating how much money of lost income
7  he had because of Don't Be Shy?
8          THE INTERPRETER:  I'm sorry.  That was "if
9  only" or "only" at the beginning of the sentence?
10         MR. SAMMATARO:  Why don't I rephrase it.
11  BY MR. SAMMATARO:
12     Q    Is it your opinion that if Mr. Lorente-Garcia
13  had only earned $50,000 in total from Algo Diferente
14  prior to the release of Don't Be Shy, that is irrelevant
15  to his actual damages?
16     A    No.  I don't consider that relevant because I
17  don't estimate the damages for the previous sales.  What
18  I estimate is the damages caused by the record label and
19  the artist that plagiarized the song.  Those are the
20  ones that I consider to be calculated.
21     Q    Okay.  So if Don't Be Shy never existed, how
22  much money would Mr. Lorente-Garcia have earned from
23  2021 to the present day?
24     A    The thing is that Mr. Lorente has not
25  received a single penny for the exploitation or the use

Page 136

1  of Don't Be Shy and that is the reason for these losses.
2      Q    Okay.  But is -- when you say lost income of
3  $2 million, is that income that you believe
4  Mr. Lorente-Garcia should have received from Don't Be
5  Shy?
6      A    Way more.  I cannot provide a legal opinion.
7  That's not my role.  I'm not an attorney, but the
8  estimates should have been much higher, this for sure.
9      Q    Okay.  Let's look at the next category of
10  un-received author royalties.  And it says the
11  un-received author royalties for the composition not
12  received by the copyright holder affected by this
13  violation are estimated at $2 million.
14         So this $2 million of un-received author
15  royalties is in addition to the $2 million of actual
16  damages?
17     A    The first one was for the plagiarism, for
18  having committed plagiarism.  In this case, these are
19  all the royalties at stake.  There are royalties for
20  various products, platforms and exploitations that Rene
21  Lorente has not received.
22     Q    What -- what platforms are you considering in
23  calculating the un-received author royalties?  What --
24  what revenue streams are you --
25     A    This was a track that catapulted Tiesto



Page 145

1  rights have been recognized by a court of law?
2      A    This would be a legal assessment and I'm not
3  in a position to discuss case law or jurisprudence.
4      Q    Turning back to page 87, is it your expert
5  opinion that the extent of the alleged plagiarism
6  entitles Mr. Lorente-Garcia to five additional million
7  dollars in damages?
8          THE INTERPRETER:  Additional?  How much, sir?
9          MR. SAMMATARO:  5 million.
10         THE WITNESS:  I clearly explained that
11  section by section and in due time, the jury will
12  decide.
13  BY MR. SAMMATARO:
14     Q    I think where we disagree is clearly because
15  I don't understand it.
16         So you say at the end of page 87, "The
17  damages are in violations to the copyright holder and
18  the extensive plagiarism and/or unauthorized copying of
19  Don't Be Shy are estimated at $5 million."
20         You see that?
21     A    Yes.  And my answer -- yes, I can see it, and
22  my answer is, yes, for that line or for the other lines
23  that are there.
24     Q    How did you calculate the $5 million number?
25     A    Yes.  One more time.  It is line by line.

Page 146

1  When you commit one violation under that, another one
2  from A to B from B to C from C to D and so on.
3          So this is the calculation for all the lines
4  and I have estimated to be approximately 5 million USD.
5      Q    Is that -- you'll see my confusion,
6  respectfully, is that A through I don't have any
7  numbers.
8          So my question is, are these -- is this
9  $5 million separate and apart in amounts actually earned
10  by the defendants?
11         THE INTERPRETER:  Can you repeat that
12  question?
13         MR. SAMMATARO:  Yeah.
14  BY MR. SAMMATARO:
15     Q    My question is, does this $5 million
16  represent amounts actually earned by the defendants, not
17  including the physical sales, the Spotify streams and
18  the YouTube views?
19     A    Yes, that is here, that is correct.  I have
20  clarified that this is violation after violation in an
21  ongoing extent of plagiarism.
22     Q    Okay.  But this is $5 million that's separate
23  and apart from the amounts that you already calculated
24  for the sales and the streams and the videos, correct?
25     A    Completely accurate.  Completely correct.

Page 147

1      Q    Okay.  Let's now turn to page 88 of your
2  report and this is titled "Massive Infringements."  And,
3  again, like you did on page 87, you list categories A
4  through J and you estimate an additional $5 million,
5  correct?
6      A    Absolutely.
7          MR. SAMMATARO:  Sebastian, I may have missed
8  something?  Santiago.  Sorry.  I said I wasn't
9  going to do it.  I did it sorry.
10         THE INTERPRETER:  He said absolutely.
11         MR. SAMMATARO:  Absolutely.  Thank you.
12  BY MS. SAMMATARO:
13     Q    Again, this additional $5 million on top of
14  the extent of the plagiarism $5 million, this is on top
15  of the digital sales, the Spotify streams and the
16  YouTube videos, correct?
17     A    Yes.  This is -- there are countless artists
18  and musicians who have massively followed the plagiarism
19  of Don't Be Shy.
20         MR. SAMMATARO:  Can you repeat that again?
21         THE WITNESS:  Yes.  There are countless
22  artists and musician who have massively followed
23  the plagiarism of Don't Be Shy.
24  BY MS. SAMMATARO:
25     Q    Okay.  When you're talking about these

Page 148

1  multiple artists, are you talking about artists other
2  than the named defendants in this case?
3      A    That is correct.  Hundreds of musicians that
4  due to the plagiarism on the infringement caused by
5  Tiesto and Karol G massively spread the global success
6  with other -- with other interpreters.
7      Q    So the massive infringement $5 million is
8  based on amounts earned by individuals who are not
9  defendants in this case?
10     A    They are not in this case, but these were
11  caused by the infringement, the lack of responsibility
12  on the plagiarism of the defendants in this case.
13     Q    Okay.  Let's turn to page 89 of your report
14  and, again, in the middle of the page -- we talked about
15  the moral rights violation, and I believe you indicated
16  that when you filed this amended report, it was before
17  this case was actually moved to Florida; is that
18  correct?
19     A    Yes, that is correct.
20     Q    Okay.  But you understand that the report --
21  if we go to the front page, if you'd like -- is actually
22  dated March 3rd of 2025, when this case has been in
23  Florida long before March 3rd of 2025, correct?
24         MR. COBO-ESTRELLA:  Counsel, if I may, if I
25  may, I think -- I don't think the witness is aware



Page 149

1   by the ruling on the judge on the dispositive
2   motion with the courses of action that were
3   dismissed.  I don't know if he's aware of that, but
4   we can't speak -- there's some causes of action
5   that were dismissed by the court if that helps
6   render the scope of -- you know, I believe -- I
7   don't know if that's helpful.
8          MR. SAMMATARO:  I just want to clarify for
9   the record, he indicated or testified that this
10  amended report was filed when the case was in
11  Puerto Rico and that's demonstratively incorrect
12  and I just want to make sure the record is clear.
13         So if you want to stipulate to that on the
14  record that this case -- when this report that
15  we're looking at has been marked as D4 was filed,
16  as we know it was from page three, because it bears
17  the caption of Altonaga -- Judge Altonaga, then I
18  will stipulate to that fact that he was mistaken on
19  his earlier testimony and I'll just move on.
20         MR. COBO-ESTRELLA:  If you're referring -- is
21  this the exhibit that was filed in the second
22  amendment in Florida?  I can't see the top part.
23  Does it have the case number at the top?
24         MR. SAMMATARO:  If you look right here on
25  the -- what's on the screen, it says case number

Page 150

1   24 --
2          MR. COBO-ESTRELLA:  That's the Florida case,
3   correct.
4          MR. SAMMATARO:  You didn't include the case
5   caption, but it has the case number and it has the
6   name of the Florida judge.
7          Why don't we just keep going?
8   BY MR. SAMMATARO:
9      Q     So on page 89 -- let's go back to page 89 --
10  moral rights, you estimate that Mr. Lorente-Garcia has
11  suffered $5 million for the violation of his moral
12  rights.
13         Now that this case is in the Southern
14  District of Florida, do you stand by that $5 million
15  damages estimate?
16     A     Yes, I stand for everything that is in my
17  report.  And during the trial, the jury will determine
18  the amount of the damages.  That is not my
19  responsibilities.
20     Q     But it is your responsibility as an officer
21  of the court to not put in a figure that is not
22  recognized by US courts, correct?
23     A     (Not translated.)
24         MR. SAMMATARO:  I'm going to move to strike
25  as nonresponsive.

Page 151

1   BY MR. SAMMATARO:
2      Q     My question was very simple -- I feel like
3   we're going to recede back to where we were earlier
4   today -- which is, do you think it's proper to offer
5   testimony to a jury based on a violation -- something
6   that is not recognized by US law?
7      A     I answered -- I fully answered the question
8   and I am willing to answer it again.  He didn't give you
9   the opportunity to translate the question and instead
10  asked another question, which I responded to.
11         And I reiterate, I stand by all the damages
12  and figures for the violations, for the infringement and
13  the sales certification.
14     Q     So let's look at the next category, if we
15  scroll down just a little bit, under "Defendant's
16  Profits."  You estimate that the plaintiff is entitled
17  to $2 million from the economic gains that the
18  infringers have obtained directly and unlawfully as a
19  result of the alleged plagiarism.
20         How did you calculate this $2 million figure?
21     A     I want to make sure that I'm in the right
22  place.  Are we examining the benefits from SoundExchange
23  section?
24     Q     No, not yet.  We'll get to that one.
25         We're at the Defendant's Profits.

Page 152

1      A     Yes, I estimate the $2 million, the profits
2   for infringing rights and plagiarism violations to the
3   music.
4      Q     But isn't this $2 million already encompassed
5   by the numbers that you reported with respect to the
6   digital sales and the streams and the YouTube videos?
7      A     No.  This is a completely different thing.
8   It's completely separate.  In this case, the composers
9   are the artists themselves.  So it's not a composition
10  where another person or artist is involved.  The key
11  figures remain the same.  Therefore, the profits are
12  countless.  Shows, sales, appearances, sponsorships, in
13  this section, we're talking about approximate profits
14  because it could be more.
15     Q     Aside from -- are you talking about shows
16  that were done by Tiesto and Karol G or are you talking
17  about other defendants?
18     A     These are approximate, but at a certain
19  point, they go together.  They're acted -- they're
20  executed and receiving both direct and benefits both
21  alone and together out of the infringement of Don't Be
22  Shy.
23     Q     What evidence do you have that anyone's ever
24  purchased a ticket to go see Karol G because she may
25  perform Don't Be Shy?



Page 153

1    THE INTERPRETER:  Because she may perform?
2    MR. SAMMATARO:  She may perform.
3    THE WITNESS:  I don't have ticket purchase
4  admittance.  I manage other artists, but not Karol
5  G.  Nor I do manage events to answer that question.
6  But I can tell you that there is a Karol G before
7  Don't Be Shy and another Karol G after Don't Be
8  Shy.
9  BY MR. SAMMATARO:
10    Q    You believe Don't Be Shy is Karol G's most
11  popular song?
12    A    I believe it's this song that catapulted
13  Karol G from being an artist to a multimillionaire
14  megastar.
15    Q    And how about DJ Tiesto, Don't Be Shy the
16  song that catapulted Tiesto into megastardom?
17    A    I currently believe this is one of his most
18  important songs and that he has made multiple business
19  deals in the United States out of this song.  Some of
20  them even illegal.  As everyone know, he's been singled
21  out for tax evasion for billions of dollars.
22    Q    Are you aware that Karol G had ten top -- ten
23  top ten songs before the release of Don't Be Shy?
24    A    I believe nine or more, but the song that
25  catapulted her in the English-speaking market, which is

Page 154

1  the desire of all Latin American artists, and I believe
2  she's from Colombia, was that song and this is a market
3  where millions of dollars are Colombian peso.
4    Q    Are you aware that DJ Tiesto was named one of
5  the best DJs of the last 20 years nine years before
6  Don't Be Shy was ever released?
7    THE INTERPRETER:  I'm sorry.  Can you repeat
8  the question?
9    MR. SAMMATARO:  Yeah.
10  BY MR. SAMMATARO:
11    Q    Are you aware that DJ Tiesto was recognized
12  as one of the best DJs of the last 20 years in 2013?
13    A    No, I don't follow his career.  It is not my
14  musical taste and I dislike what he does infringing
15  rights with his music and mixes.
16    Q    How do you know that DJ Tiesto infringes
17  rights in creating his music aside from the allegations
18  in this case?
19    A    This scorpion stings because it's in its
20  nature to sting not because it's evil.  His nature is to
21  take what doesn't belong to him in order to create
22  mixes.  I'm not saying that I didn't know his work.  I
23  don't follow his career because I dislike what he does.
24    Q    But how do you know he doesn't have licenses
25  to use the songs that he remixes?

Page 155

1    A    Is it not my place to know whether he has a
2  license or not.  But what he does is remixing and it's
3  impossible to deal with the amount of tracks he drafts
4  in a thousand little pieces to petition licenses and do
5  it correctly.
6    His behavior has always been to take what
7  doesn't belong to him.  In my report, there's an example
8  of the song La Paloma where he sings it in Spanish and
9  appropriates the composition as if he were the composer.
10  That's in the report.
11    Q    So is your expert report driven in part by
12  your belief that DJ Tiesto is a repeat copyright
13  infringer?
14    A    This report is specifically based on the
15  plagiarism of the song Algo Diferente by Don't Be Shy.
16    Q    Okay.  Going back to your damages analysis,
17  you indicate that there is $2 million of SoundExchange
18  revenue, correct?
19    A    That is correct.
20    Q    And this is $2 million that you believe the
21  defendants have received from SoundExchange from Don't
22  Be Shy?
23    A    Yes, that is correct.  It was my
24  approximation, $2 million.  I have seen SoundExchange
25  reports with those amounts and I believe that this is

Page 156

1  actually a very conservative figure.
2    Q    Okay.  You haven't seen SoundExchange reports
3  for Don't Be Shy though, correct?
4    A    That is correct.  This is my approximation.
5  They have not provided the books or seeing the figures.
6  That is the intention of the attorney.
7    Q    Let's turn to page 90 of your expert report.
8    THE VIDEOGRAPHER:  Excuse me, counsel.  I'm
9  going to have to reset the recording.  We're at two
10  hours again.
11    MR. SAMMATARO:  I'm going to try to go for
12  five more minutes.  So, yeah, let's just reset.
13  Maybe ten minutes.
14    THE VIDEOGRAPHER:  Going off the record.  The
15  time is 5:34.
16    (A recess was taken.)
17    THE VIDEOGRAPHER:  We are back on the record.
18  The time is 5:38.
19  BY MR. SAMMATARO:
20    Q    Mr. Viera, is your opinion that the
21  infringement in this case has been willful?
22    A    Fully.
23    Q    And what is the basis of your opinion that
24  the infringement was willful?
25    A    In one part of the report, I discuss the



Page 175

1    Q    Don't Be Shy is in a minor key, correct?
2    A    Algo Diferente is in D minor and Don't Be Shy
3  is in B minor.
4    Q    Is D minor the only key that Algo Diferente
5  uses?
6    A    There is the original key of Algo Diferente.
7    Q    And what is that original key?
8    A    I already answered.  It's D minor.
9    Q    Do you dispute that Algo Diferente changes
10  from a major key --
11         MR. COBO-ESTRELLA:  Counsel, correction.  He
12    said re menor, and the interpreter said D minor.
13    Not the same thing.  So I want to make sure that's
14    correct and any degradation, Counsel.
15    Can the witness restate his response.
16         THE INTERPRETER:  I'm sorry.  Re menor is D
17    minor in English.
18         MR. SAMMATARO:  He said D minor.
19         THE INTERPRETER:  You are disputing that
20    re menor is not equivalent to D minor in English?
21         MR. COBO-ESTRELLA:  Was it (speaking
22    Spanish)?
23         THE INTERPRETER:  Yeah, I mean, re menor in
24    English is D minor.
25         MR. COBO-ESTRELLA:  First time I hear that,

Page 176

1  but all right.
2         THE INTERPRETER:  Because in Spanish we use
3    (speaking Spanish).  In English they use other
4    letters.  They don't use (speaking Spanish).
5    And --
6         Excuse me?
7         MR. COBO-ESTRELLA:  You're calling it D; is
8    that what you said?  D minor?
9         THE INTERPRETER:  (Speaking Spanish) is D.
10    Re menor equivalent in English is D minor.
11         MR. COBO-ESTRELLA:  Okay.  Thank you for the
12    explanation.
13  BY MR. SAMMATARO:
14    Q    Would you agree with me, sir, that Algo
15  Diferente changes from a major key to a minor key?
16         THE INTERPRETER:  Give me one -- can you
17    repeat the question, please?
18         MR. SAMMATARO:  Yeah.
19  BY MR. SAMMATARO:
20    Q    Would you agree with me, sir, that Algo
21  Diferente changes from a major key to a minor key?
22    A    I did not make that musical arrangement.
23  That was Rene Lorente's work.  He would be the one to
24  explain those changes because that is his arrangement.
25    Q    But you are serving as a musicologist in this

Page 177

1  case, correct?
2    A    Yes, correct.
3    Q    Are you unable to state here under oath
4  whether or not Algo Diferente changes from a major key
5  to a minor key?
6    A    I do not want to get into the structure of
7  the arrangement because that is not my role.  I didn't
8  do the arrangement.
9         I prepared the report.  The report, it's
10  clear.  It's in those eight bars.  The full sheet of the
11  original arrangement isn't included because the
12  plagiarism lies within those eight bars.
13         Even the arranger himself if asked that
14  question couldn't answer just from memory.  He would
15  need to have the arrangement in front of him to be
16  clear, especially considering everything he's done
17  throughout his career.
18    Q    Algo Diferente contains bars in both 4/4 time
19  and 2/4 time, correct?
20         THE INTERPRETER:  Can you repeat that
21    question?
22         MR. SAMMATARO:  Yeah.
23  BY MR. SAMMATARO:
24    Q    Algo Diferente contains bars in both 4/4 time
25  and 2/4 time?

Page 178

1    A    Within the eight bars, which is what I
2  analyzed, I will have to look at the original
3  arrangement which I did not analyze.  I didn't need to
4  analyze the full arrangement.  It was just those eight
5  bars.
6         The piece has a solo, a musical bridge, a
7  mambo.  None of that was part of my analysis.  The
8  plagiarism is in those eight bars and that's what's in
9  the report.  Anything beyond that would be speculation
10  and I'm not here to speculate.
11    Q    Okay.  Well, let's go to your affirmative
12  report which is previously marked as D4.  Go to page 28.
13         And here we're looking at 16 measures,
14  correct?
15         THE INTERPRETER:  I'm sorry.  You said 16 or
16    60?
17         MR. SAMMATARO:  One-six, 16.
18         THE WITNESS:  Yes, there are 16 measures.
19  BY MR. SAMMATARO:
20    Q    Okay.  And what are the eight bars shown --
21  if you can demonstrate to me, what are the eight bars
22  that you limited your analysis to?
23    A    The first eight bars.
24    Q    Okay.  So why does this transcription contain
25  measures beyond just the first eight bars?



Page 191

1    Q    In that you have testified now repeatedly
2  that you received the transcriptions directly from
3  Mr. Lorente-Garcia, are you still claiming that the
4  transcriptions contained in your affirmative report
5  constitute your expert testimony?
6        MR. COBO-ESTRELLA:  Objection to the form of
7    that question.
8        THE WITNESS:  I have received everything in
9    an organized manner.  I received the original
10       arrangement of Algo Diferente and a transcription
11       of Don't Be sigh -- Don't Be Shy.  That is what I
12       have said.
13  BY MR. SAMMATARO:
14    Q    And my question is is, since you did not do
15  the transcription of Don't Be Shy and since you just
16  simply received the original arrangement from
17  Mr. Lorente-Garcia, are you claiming to be an expert on
18  the original arrangements and the transcriptions
19  contained in your expert reports?
20    A    I didn't do any of the two arrangements.  I
21  received the original arrangement and the transcription.
22    Q    You indicated in your testimony that there
23  are errors and that there are horrors.
24        Are you accusing Dr. Ferrara of manipulating
25  the chords as he lists them in paragraph 64 of his

Page 192

1  rebuttal report?
2    A    What I have here is Mr. Ferrara's report
3  where he says that I made errors, and I am pointing out
4  his horrors because Algo Diferente is not a
5  transcription.  It's the original arrangement and he has
6  no standing to say that the original work by the
7  arranger is wrong.
8        As for Don't Be Shy, if there are any
9  discrepancies in that transcription, it's not on me
10  because I didn't made it -- didn't make it.
11    Q    Is it your musicological testimony that an
12  arrangement can never be challenged?
13    A    I don't understand.  It seems to be an
14  incomplete question.  I don't understand what
15  Mr. Sammataro is trying to ask.
16    Q    You said, who is Dr. Ferrara to question the
17  original arrangement, and my question, based on your
18  sworn testimony, is, do you believe that an original
19  arrangement can never be challenged, that what it says
20  has to be accepted?
21    A    When it is an original arrangement, it should
22  not be challenged.  If he want to do it -- if he wants
23  to do it, well, he has but he would perhaps be -- is
24  being irresponsible.
25        Now, when an arranger creates an original

Page 193

1  arrangement himself, what is there to question as wrong?
2  On the other hand, if it were being performed by a band
3  of 30 or 40 musicians and there was something else in
4  the sheet music that -- that was distributed, maybe a
5  musician could say, hey, I'm playing the second trombone
6  and I think that I know it's missing because the first
7  and the third trombone have something different, that
8  would make sense.  But a conductor is not to be
9  questioned.  Even if he's reading the newspaper upside
10  down.
11    Q    Okay.  Let's go to page six of your rebuttal
12  which has been marked as D13.  Okay.  And let's go to
13  page number six.  We're just getting the document up.
14        The melody in Don't Be Shy is diatonic,
15  correct?
16        THE INTERPRETER:  I'm sorry.  Can you repeat
17    the question?
18        MR. SAMMATARO:  Yeah.
19  BY MR. SAMMATARO:
20    Q    The melody in Don't Be Shy is diatonic?
21  D-i-a-t-o-n-i-c.
22    A    You are referring to a section of my report?
23    Q    No, not yet.  At the present moment, I'm just
24  asking you whether or not the melody in Don't Be Shy is
25  diatonic.

Page 194

1    A    I would like to refer only to what is stated
2  on my report.  Otherwise it would be speculation.
3    Q    So as you sit here today, without looking at
4  your report -- I'm questioning whether you wrote -- do
5  you know whether or not the melody of Don't Be Shy is
6  diatonic?
7    A    You're wrong.  I'm not watching the report.
8  I'm only answering your questions.
9    Q    So answer my question.
10        Is the melody in Don't Be Shy diatonic?
11    A    I am not going to refer to something that is
12  not in the report.  I will not conduct a live
13  examination of something that is not included in the
14  report.
15        If something -- if there is such a part in
16  the report, I will ask you to please point out to me and
17  refer to that part of the report.
18    Q    Well, first I'm going to ask you, do you
19  believe whether or not you offered a punitive expert
20  opinion in this case as to whether or not the melody of
21  Don't Be Shy is diatonic?
22        THE INTERPRETER:  I'm sorry.  Can you repeat
23    that?  A punitive?
24        MR. SAMMATARO:  Yeah, punitive.
25        THE INTERPRETER:  Can you repeat the whole



Page 195

1    question, sir?
2            MR. SAMMATARO:  Yeah.
3    BY MR. SAMMATARO:
4        Q    As you sit here today under oath, do you know
5    if you offered an expert opinion as to whether or not
6    the melody in Don't Be Shy is diatonic?
7        A    Mr. Sammataro, please point out the section
8    that you are referring to on my report.
9        Q    Are you refusing to answer my question like
10   you did during the first part of your deposition?
11           I just want to be clear, 'cause I am going to
12   bring this to the court' attention.  So I want to be
13   clear, are you refusing to answer my question?
14           And if you don't know the answer, you can
15   just say you don't know.
16       A    I don't want to refer to something that
17   cannot be substantiated by my report.
18           Seeing as you are not pointing out to a
19   specific section of that report, I can say right now
20   that I cannot answer.
21       Q    Is the melody of Algo Diferente solely
22   diatonic?
23           THE INTERPRETER:  Solely?
24           MR. SAMMATARO:  Solely.
25           THE WITNESS:  I cannot answer to that

Page 196

1    question because you are not referring to my
2    report.
3    BY MR. SAMMATARO:
4        Q    Is the reason why you can't answer my
5    questions is because you didn't write your report and
6    you don't know what's in it?
7        A    I wrote -- I drafted my report from the first
8    page until the last one fully and completely and it was
9    signed by me.  There should not be any questions about
10   that.
11       Q    That's not true, sir.  You did not write your
12   transcriptions.
13           MR. COBO-ESTRELLA:  Counsel, at this time, I
14       understand there is a discrepancy between what
15       you're asking and what his testimony is.
16           I want to remind the witness to respond to
17       your questions.  If there is question he cannot
18       recall, then he simply needs to state so or he
19       needs to respond, so I want to make sure the
20       witness understands that.
21           If you're -- if the interpreter could express
22       this for the witness to understand.
23           THE WITNESS:  Counsel, I wrote my entire
24       report myself.  You said that I hadn't written it,
25       but I did.  As for the transcriptions and

Page 197

1    arrangements I already declared under oath that I
2    received them as they are.
3            Also some covers and drawing, I did not draw
4    anything.  I'm referring to the writing and the
5    analysis, all of that was done by me.
6    BY MR. SAMMATARO:
7        Q    What does it mean for a melody to be
8    diatonic?
9        A    I want to refer specifically to the report.
10   What I have stated in my report is that the soul, the
11   hook of the song was violated, was stolen.  The rest are
12   matters that if they are not in my report, I cannot
13   irresponsibly speculate about.
14       Q    Sir, you purport to be a musicologist.  I'm
15   asking you a very simple musicological question.  If you
16   can't answer it, just say you can't answer it, but don't
17   waste my time and don't waste the court's time.
18           What does it mean for a melody to be
19   diatonic?
20           That has nothing to do with your report.
21   It's a simple question.
22       A    I repeat, I cannot answer that.
23       Q    You cannot answer that because you do not
24   know?
25       A    I cannot answer.

Page 198

1        Q    Because you do not know or because you're
2    refusing?  I need to have a clear record, sir.
3            MR. SAMMATARO:  And, Humberto, you need to
4        instruct your -- your witness to answer this
5        question.
6            MR. COBO-ESTRELLA:  Opposing counsel is
7        asking you a simple question and he wants -- he
8        needs you to respond.  Please provide a response.
9            THE INTERPRETER:  I'm sorry.  Can you say
10       that again?  You're a bit far away and it's hard
11       for me to hear you.
12           MR. COBO-ESTRELLA:  For the record, this is
13       Attorney Cobo-Estrella for the plaintiff.  I'm
14       instructing the witness to respond to plaintiff's
15       [sic] counsel's questions.  Defense counsel is
16       asking you a question I need you to answer it.
17       Please respond.
18           THE WITNESS:  Right now, I cannot recall
19       exactly what is the definition.
20   BY MR. SAMMATARO:
21       Q    Let's go to page six of your rebuttal report.
22   Okay.  On the "Harmonic function," on the second bullet
23   point, it says, "The use of non-diatonic passing chords
24   reflects Rene Lorente's jazz-influenced harmonic
25   approach which is not generic."



Page 203

1  BY MR. SAMMATARO:
2      Q     What is the musicological definition of
3  "expressive color"?
4      A     There are many definitions.  It depends on
5  the person but expressive color refers to the
6  originality of the melody, a unique and expressive tone.
7  It's something that could also be considered original, a
8  distinctive thing.
9      Q     And just so I understand your testimony
10  correctly, you're saying that expressive color is an
11  accepted musicological term?
12      A     Yes.  It could be something that you say to a
13  person or a musician for him or her to be successful.
14  It refers to their originality.  It's a way of
15  explaining their unique sounds or voice.  If it fits, yes.
16      Q     What is the musicological definition of
17  "essential nature"?
18      A     These could also have several definitions
19  depending on who says it and on the book, but it can
20  refer, for example, when you say that a rhythm belongs
21  to a certain genre, that is its essential nature.  The
22  musician plays in a certain way.  That is their
23  essential nature.  Just like a person whose nature can
24  be good or bad.
25      Q     What does the word "tonic" mean in

Page 204

1  musicological terms?
2      THE INTERPRETER:  I'm sorry.  Which word?
3      MR. SAMMATARO:  Tonic, t-o-n-i-c, tonic.
4      MR. COBO-ESTRELLA:  Counsel, objection.
5  Asked and answered.
6      MR. SAMMATARO:  I never asked the word tonic
7  once.  First time I mentioned the word in a day and
8  a half.  So I'm going to stand on my question.
9      MR. COBO-ESTRELLA:  So the question -- I
10  thought he had answered that question?  No?
11      MR. SAMMATARO:  No.  You interrupted him.
12      MR. COBO-ESTRELLA:  No, counsel.  I'm asking
13  if you're asking a question you already asked
14  and --
15      MR. SAMMATARO:  I never used the word tonic
16  once.  I already answered you.  You're being
17  disruptive.
18  BY MR. SAMMATARO:
19      Q     My question, to be translated, is, what does
20  the word -- what is the musicological definition of the
21  word "tonic"?
22      A     I do not recall that answer right now.  I
23  don't have it.  The definitions of tonic, diatonic, I
24  don't have those right now.
25      Q     Do you know what the "circle of fifths" is?

Page 205

1      THE INTERPRETER:  The circle of what, sir?
2      MR. SAMMATARO:  Fifths, circle of fifths.
3      THE INTERPRETER:  Fist, f-i-s-t.
4      MR. SAMMATARO:  Yeah, fifths, f-i-f-t-h-s.
5      THE WITNESS:  You are trying to conduct a
6  musicology exam or test on me.  See, there are many
7  descriptions that I looked for in books when I
8  drafted my report that I currently cannot recall.
9  BY MR. SAMMATARO:
10      Q     Do you dispute that there are thousands of
11  songs that use the circle of fifths?
12      A     Yes, but you're asking me for the definition
13  and I cannot provide that right now.  It seems like
14  you're asking me about many things from way before.
15      Q     I just want to be clear.  You are
16  representing that you are an expert musicologist and I'm
17  allowed to ask and test your musicological knowledge.
18  So this is entirely appropriate.
19      A     The fifths is something that exists since a
20  long time ago in times of Mozart, etcetera.  But these
21  are two different questions.  You asked about the
22  definition and it's something that I do not recall right
23  now exact.
24      Q     Can any artist own the circle of fifths?
25      A     It is a hypothetical question that I cannot

Page 206

1  answer right now.
2      Q     Do you dispute --
3      THE VIDEOGRAPHER:  I'm sorry, Counsel, to
4  interrupt.  I need to reset the video recording if
5  we can just take like 20 seconds.
6      MR. SAMMATARO:  Sure.
7      THE VIDEOGRAPHER:  Going off the record.  The
8  time is 3:35.
9      (There was a pause in the deposition.)
10      THE VIDEOGRAPHER:  We are back on the record.
11  The time is 3:36.
12  BY MR. SAMMATARO:
13      Q     Sir, would you agree with me that the circle
14  of fifths is the basic music building block for Algo
15  Diferente?
16      A     That is something that would be on the
17  arranger.  I have told you several times, I am not the
18  arranger of Algo Diferente.
19      Q     Correct.  But you did opine that Algo
20  Diferente is 100 percent original, correct?
21      A     Yes, that is correct.  There are three ways
22  in the industry in which you can create a song.  You can
23  compose it.  You can interpolate or you can plagiarize
24  it.  Algo Diferente, it's original.
25      Q     And does Algo Diferente contain the circle of



Page 219

1    Are you aware of Don't Be Shy being used in
2 any television commercial which you could see with your
3 own eyes?
4    A    In TV, the launch of this song was on many
5 national and international channels because its launch
6 was multimillion dollar launch broadcasting from Las
7 Vegas in various ways including satellite.
8    So the question would be whether it can be
9 verified because they haven't opened their books and
10 they have not certified anything.
11    Q    Let's do it this way.  Let's just do yes or
12 no questions.
13    Have you seen Don't Be Shy in any television
14 commercial?  Yes or no?
15    A    TV commercial, no, I have not seen it.
16    Q    Okay.  And are you aware of Don't Be Shy
17 being used in any movie?  Yes or no?
18    A    Completely unknown.
19    Q    Okay.  And you believe that Don't Be Shy was
20 featured on television?  Are you talking about the music
21 video or the song being performed publicly?
22    A    When the video comes out, the song is being
23 played.  So I would say both.
24    Q    Okay.  Are you talking about the video that's
25 been on YouTube or you're saying that a television

Page 220

1 station broadcast the video of Don't Be Shy?
2    A    The two videos -- the two videos and the
3 making of not only through YouTube but all TV stations.
4 When the first video was launched and previously they
5 make enough, this was broadcasted in TV.
6    Q    What channels?
7    THE INTERPRETER:  Sorry?
8 BY MR. SAMMATARO:
9    Q    Yeah.  On what channels or what countries?
10    A    I wouldn't be able to tell you exactly on
11 which channels, but if I could have a SoundExchange or a
12 royalty statement, it could be 30 pages long detail --
13 detailing all the stations.
14    Q    You believe that Tiesto and Karol G made
15 $10 million from live performances because of Don't Be
16 Shy?
17    A    Yes, and I was conservative because it could
18 be four or five or six times higher.
19    In the case of Tiesto, he has tax evasion for
20 over 30 millions.  If the IRS demands 30 million,
21 imagine how much he actually made.
22    For Karol G this opened the door for her in
23 the USA and all over the world, as she has said herself.
24 This is an estimate, but if you can look or you can
25 search on TV her statements where she talks about the

Page 221

1 before and after on Don't Be Shy.  This song catapulted
2 her and she also talks about the many times she had to
3 record it.
4    Her statement are available in Jorge Pabón
5 Molusco TV.  You can find her how she talks about how
6 she needs to sing Don't Be Shy in her performances and
7 what that success has meant to her.
8    So we have a triple panorama here, Tiesto by
9 himself, Karol G by himself [sic] and Tiesto an Karol G
10 together.  Either of the two artists on their own have
11 made more than 10 million and you need to consider Karol
12 G's boom after this song.
13    Q    Are you attributing every dollar that Karol G
14 made from her live performances to Don't Be Shy?
15    A    Karol G was a successful artist, but after
16 that, she became a global megastar increasing her fees.
17 Anyone trying to book her wouldn't pay just one or
18 $2 million.  They would pay way more for a performance.
19    Q    What was Karol G's fees before Don't Be Shy?
20    A    Way under $300,000 depending on the venue and
21 she didn't have an international audience or public in
22 Puerto Rico if she was not next to Anuel.
23    Q    So isn't Anuel responsible for her rise in
24 popularity and not Don't Be Shy?
25    A    Don't Be Shy catapulted her.  Before Don't Be

Page 222

1 Shy, it was Anuel.  They were a couple and she went hand
2 in hand with him.  After Anuel was no longer in the
3 picture, she emerged as an artist after this song and
4 I'm not just saying that.  Look at the charts, the
5 successes, the sales.
6    Q    How much did Karol G's performance fee rise
7 because of Don't Be Shy?  What percentage?
8    A    I could give you an approximate figure of 60
9 to 70 percent.
10    Q    And how about Tiesto, how much did his
11 performance fee increase from before Don't Be Shy to
12 after Don't Be Shy?
13    A    I would say similarly because he needed to
14 consolidate himself in the US market and now he's
15 answering for tax evasion.
16    Imagine if he owes 30 millions in taxes, how
17 much was he making.  200, 300, 400 million perhaps.  So
18 I would say the same, 60 to 70 percent.
19    Q    I'm going to counsel you that you have
20 repeatedly during the last two days of your deposition
21 talked about Tiesto's tax evasion which he's never been
22 convicted of and I just want to warn you, you're outside
23 the scope of your opinion and you're exposing yourself
24 to a defamation claim.  So not my legal advice to give
25 you, but you should watch your words very carefully.



Page 215

1    A    No.  He provided the original arrangement of
2  Algo Diferente and made a transcription of the track
3  Don't Be Shy in those eight bars.
4        What he wanted to highlight here are the
5  figures he uses for timing and duration which are same,
6  the same arrangement, the same relationship.
7        So in some parts, he places the transcription
8  against Algo Diferente showing the descending pattern.
9        The report details before each time the music
10  sheet with the eight bars appears the reason why it
11  appears.
12    Q    Let's go to -- back to D13, your rebuttal
13  report, and let's go to page number eight.
14        Under number two "Melodic Comparison," you
15  write, "In the original song titled Algo Diferente, the
16  melody descends from the tonic of the Cmaj7 chord."
17        What did you mean by the use of the word
18  "tonic" in that sentence?
19    A    The melody -- the melody is descending from a
20  tonic.  That is what I meant.
21    Q    Yeah.  But what is a tonic?
22    A    I already answered that question.  It is a
23  definition just as other definitions that I don't
24  recall.
25    Q    Well, how could you write or make a

Page 216

1  conclusion that Algo Diferente descends from the tonic
2  of the C major chord if you don't know what tonic is or
3  means?
4    A    I did not say that I didn't know it.  I said
5  that I -- I said that I did not recall it.
6        For example, I could say that one note is
7  ascending on the -- the non [sic] and that is a concept
8  that you would need the definition for and you perhaps
9  wouldn't have it at the moment.  The note, the tone is
10  descending.
11        THE INTERPRETER:  Excuse me.  Is it okay if
12  we take a break like five or ten minutes?
13        MR. SAMMATARO:  Sure, let's do that.
14        THE INTERPRETER:  Thank you.
15        THE VIDEOGRAPHER:  One moment.
16        Going off the record.  The time is 4:14.
17        (A recess was taken.)
18        THE VIDEOGRAPHER:  We are back on the record.
19  The time is 4:26.
20        Off the record.  The time is 4:26.
21        (There was a pause in the deposition.)
22        THE VIDEOGRAPHER:  Back on the record.  The
23  time is 4:26.
24  BY MR. SAMMATARO:
25    Q    Okay.  Mr. Viera, with the reservation of

Page 217

1  rights to challenge it because I believe it's untimely,
2  I want to ask you about the rebuttal -- the surrebuttal
3  that you submitted on March 21st which I'm going to mark
4  as D14.
5        (Defendant's Exhibit 14 was marked for
6        identification.)
7  BY MR. SAMMATARO:
8    Q    I should have said March 26th.  My apologies.
9        So, Mr. Viera, if we can turn to page seven
10  and eight of this surrebuttal, and I want to focus your
11  attention right now to the chart that's on page
12  number seven and right -- right under Roman numeral
13  three, "Below is a detailed breakdown of the actual
14  revenues generated by the plagiarized song Don't Be
15  Shy."  And then you'll see there's a column that says
16  "Estimated Revenue."  So are the numbers that are listed
17  in this chart that starts with "A, Direct Revenues," are
18  these actual revenues or are these estimated revenues?
19    A    What I included in this section and I did not
20  include other platforms and I stated estimates.
21    Q    Okay.  So your expert belief -- or your
22  expert opinion is that Don't Be Shy generated
23  $15 million from streaming sources or streaming
24  platforms?
25    A    This -- it could have been more.  We are

Page 218

1  talking about countless platforms in what is called
2  streaming and I as -- and as I explained the day before,
3  we were not talking about authorship.
4        As here, the violations continued in
5  everything that was generated where the track was used,
6  remixes, everything that comes from Rene Lorente.  It's
7  an estimate but it could be more.  This track was on the
8  top 20 worldwide.  This is just an estimate.
9        In the case of the song Don't Be Shy, it's
10  something unique because not all artists make two music
11  videos for the same song.  Here they made two videos.
12        What I have never seen before, it's also that
13  they have loaded the song on rapid and found a full
14  hour, five hours or even ten hours of Don't Be Shy.
15    Q    Okay.  You estimate $4 million in licensing
16  and sync.
17        Are you aware of Don't Be Shy actually being
18  used in any commercials, movies or television?
19    A    I estimated it in 4 million, not in 10
20  million and I did an approximate number -- an
21  approximate figure because the ones that could certify
22  the actual revenue of income received or income
23  non-received are those who need to open the books, the
24  record label and the artists.
25    Q    My question was a little different.



Page 231

1   that another expert has a bias?  Yes or no?
2        We don't need an explanation.  Yes or no?
3   A    I did what I had to do.  I fulfilled my
4   responsibility.
5        I am listening to Mr. Sammataro, but I don't
6   know where he is.  I cannot see him.
7   Q    You see me now?
8        I'm going to ask my question for a third
9   time.
10        Do you think it's appropriate for one expert
11  to opine on the credibility of another expert?  Yes or
12  no?
13  A    Yes, if there is an error, if it's wrong,
14  yes, it is my obligation.
15  Q    Okay.  Let's go to page five of your
16  surrebuttal.  You indicate on the bottom of the page --
17  scroll down -- under point number four, it says
18  "Massarsky claims that only 7.8 percent of the
19  plagiarized song Don't Be Shy is infringing but fails to
20  present any independent musicological analysis to
21  support this figure."
22        Do you see that?
23  A    Yes, I can see it.
24  Q    Okay.  You understand that Barry Massarsky
25  was not retained to provide a musicological analysis,

Page 232

1   correct?
2        MR. COBO-ESTRELLA:  Counsel, the record --
3   for the record, he showed -- the witness brought
4        with him three textbooks that apparently authored.
5        You had asked -- I think you had asked about this
6        on the first day of the deposition for his
7        published works.
8        MR. SAMMATARO:  Okay.  I'm waiting for --
9        THE WITNESS:  If he had present a sheet or a
10        document showing the shares, he could have reached
11        a serious conclusions, but he reached a conclusion
12        without having a sheet stating what had -- what
13        corresponds to Rene Lorente.  So in the -- in the
14        way he assigned the shares, he was mistaken.
15  BY MR. SAMMATARO:
16  Q    Is it your expert opinion that if any portion
17  of Don't Be Shy infringes Algo Diferente then plaintiff
18  is entitled to recover 100 percent of all amounts
19  generated from Don't Be Shy?
20  A    Absolutely.  Due to all the infringements, he
21  would be entitled to cover a hundred percent of all the
22  money for all the illegal use and exploitation of Algo
23  Diferente.
24  Q    So under your expert opinion, the plaintiff
25  is entitled to 100 percent of the profits generated from

Page 233

1   Don't Be Shy?
2   A    Yes.  Once you do something without
3   authorization or without revenue sharing, it doesn't
4   count and that's not just my opinion.  It's a hundred
5   percent because the violations are present.
6        When you do it without permission, it's
7   100 percent, not whatever percentage Mr. Massarsky
8   determines.  You cannot just eat the cake and then give
9   out a little bit, a little portion of the cake.
10  Q    Do you know what an attribution analysis is?
11  A    Yes.  Yes.  It's about attributions.  For
12  example, take this for you in an arbitrary fashion.
13  Q    Can you just repeat that last sentence?
14  A    Yes.  It is about attributions.  This is what
15  belongs to you in an arbitrary fashion.
16  Q    Well, isn't an attribution analysis based on
17  the profits that are attributable to the infringement?
18  A    I prepared a detailed report of all the
19  damages.  In conducting the analysis, anything that is
20  not accounted for as belonging to Rene Lorente is an
21  irresponsible attribution by someone who has taken
22  ownership of what is rightfully his.
23  Q    Go to page six of the sur report, go towards
24  the bottom of the page, you state that "Massarsky cannot
25  use the commercial success of the original work Algo

Page 234

1   Diferente as a barometer for calculating damages since
2   it is irrelevant to the assessment of harm caused by the
3   exploitation of the plagiarized song Don't Be Shy."
4        Is it your opinion that the revenues actually
5   earned by Algo Diferente are irrelevant to an actual
6   damages analysis?
7   A    Rene did not sue himself.  Algo Diferente
8   didn't commit plagiarism.  This is about the plagiarism
9   in Don't Be Shy.  You cannot compare a Toyota to a
10  Porsche.  I couldn't even compare Tiesto to Bad Bunny.
11  It's not the same.  The success of Algo Diferente with
12  its compact disks is his success.  So much so that they
13  took it since his greatest hit and repeated it because
14  it had a unique sound.
15  Q    Let's go to page eight of your surrebuttal.
16        You -- under the numbers, you write "The
17  opinions expressed by the so-called expert Barry
18  Massarsky in his report are not only extremely erroneous
19  but also clearly demonstrate a deliberate manipulation
20  of facts to favor the record labels and music publishers
21  named as defendants in this case."
22        Tell me which facts Mr. Massarsky
23  manipulated?
24  A    I am talking about manipulated facts like
25  leaving out the RIAA, like using Billboard-affiliated



Page 235

1  platform when Billboard itself stated that if a jury
2  heard it, they would determine that it is a copy. They
3  would say that it is identical. The percentage that he
4  manipulated taking down going from a hundred to
5  7.5 [sic] percent. That is all in the report. He
6  manipulated a figure to suit his argument. Where did he
7  get that figure from?
8      Q     Your testimony is that Billboard has written
9  an article that says Don't Be Shy infringes Algo
10  Diferente?
11     A     The Billboards -- the legal counsel for
12  Billboard is September 2023, he published. Normally
13  legal counsel don't make publications. That's usually
14  done by journalists, but he made a statement about the
15  plagiarism and said that if the jury heard the track,
16  they will say that it is an identical copy. He
17  published that himself. And that should -- that is
18  something that should -- that --
19         THE INTERPRETER: I need to confirm the last
20     name that he mentioned, but something that the last
21     name heard because all law firms heard that.
22         THE WITNESS: Because Billboard is a magazine
23     that arrives at most law firms and Peter Donahue --
24     Pete Donahue discusses that the combination of
25     sounds, if heard by a jury, would conclude that it

Page 236

1      is identical and that is something that was
2      published.
3  BY MR. SAMMATARO:
4      Q     Let's go to page seven -- no -- page 14 of
5  your rebuttal. You write the very top of the page "The
6  true expert in this case, this expert, Richie Viera, has
7  clearly and accurately exposed the fraudulent scheme
8  behind the exploitation of the plagiarized song Don't Be
9  Shy. And his report should be considered the most
10  accurate assessment of the real damage suffered by Rene
11  Lorente."
12         Do you see that?
13     A     (No English response.)
14     Q     And you wrote that?
15     A     Yes, it is signed by me.
16     Q     Okay. And you believe it's within the
17  province of an expert witness to call another expert
18  witness a nonexpert?
19     A     I already -- I said that the truth is the one
20  that I'm asserting and we can talk about those five
21  lines that that is just an explanation -- I'm sorry --
22  that is just a summary of the explanations of all the
23  failures that were exposed before.
24     Q     Do you remember that in connection with your
25  March 17th rebuttal report you submitted a audio track?

Page 237

1      A     That is correct.
2      Q     Okay. And did you create that audio track
3  yourself?
4      A     That is correct.
5      Q     Okay. And it says here that you directly
6  overlaid Karol G's vocal performance over the
7  instrumental arrangement of Algo Diferente, correct?
8      A     Yes, it what -- it is what appears in the
9  soundtrack.
10     Q     Okay. And did you manipulate the soundtrack
11  in any way?
12     A     It is overlaid there one on top of the other.
13     Q     Did you lower the pitch in Algo Diferente
14  when you were creating Exhibit A?
15         THE INTERPRETER: Give me one second, please.
16         THE WITNESS: I placed one on top of the
17     other.
18  BY MR. SAMMATARO:
19     Q     Okay. Did you increase the tempo of either
20  song?
21     A     No, not at all. It is an underlay as I
22  mentioned, one on top of the other.
23     Q     So the eight bar --
24         MR. SAMMATARO: Excuse me?
25         MR. COBO-ESTRELLA: You're referring to an

Page 238

1  audio track of some sort. Will you be making that
2  a part of that exhibit for the deposition?
3         MR. SAMMATARO: Sure. Why don't we take a
4      two-minute break and I will go get the audio track
5      that Mr. Viera submitted, but I will -- I'll get
6      it. So let's go off the record and I'll go get it.
7         THE VIDEOGRAPHER: One moment, please.
8         Going off the record. The time is 5:41.
9         (A recess was taken.)
10        THE VIDEOGRAPHER: Back on the record. The
11     time is 5:47.
12  BY MR. SAMMATARO:
13     Q     So let's first go to the expert report,
14  March 17th rebuttal. Okay. So let's go to page 17 and
15  you'll see in the second sentence under the analysis of
16  exhibit A, it reads, "Upon reviewing the audio evidence
17  presented in exhibit A, it becomes unequivocally clear
18  that the original composition, Algo Diferente, was
19  entirely plagiarized in the song Don't Be Shy."
20        And my first question is, you created the
21  audio evidence, correct?
22     A     Correct.
23     Q     Now let's play it.
24        (Audio played.)
25  BY MR. SAMMATARO:


ESQUIRE
DEPOSITION SOLUTIONS