UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-23066-CIV-ALTONAGA/Reid

**RENE LORENTE-GARCIA**,

    Plaintiff,
v.

**CAROLINA GIRALDO-NAVARRO**,
*et al.*,

    Defendants.
_____/

# ORDER

**THIS CAUSE** came before the Court upon two motions filed by Defendants, Carolina Giraldo-Navarro ("Karol G"), Tijs Michiel Verwest ("Tiësto"), Atlantic Recording Corporation ("Atlantic"), Kobalt Music Publishing America, Inc. ("Kobalt"), Sony Music Publishing (US) LLC ("Sony"), and Warner Records Inc. ("Warner"): a Motion for Summary Judgment ("MSJ") [ECF No. 107], and a Motion to Exclude Plaintiff's Proposed Expert ("*Daubert* Motion") [ECF No. 110], both filed on April 28, 2025. Plaintiff, Rene Lorente-Garcia filed Responses to both Motions [ECF Nos. 122 and 118, respectively]; to which Defendants filed Replies [ECF Nos. 139 and 124, respectively]. The Court has carefully considered the record, the parties' written submissions, and applicable law.[1] For the reasons that follow, the Motions are granted.

## I. BACKGROUND

This copyright infringement action concerns two musical works: Plaintiff's 1998 song *Algo Diferente* ("AD"), and the 2021 track *Don't Be Shy* ("DBS"), performed by Tiësto and Karol G.

---

[1] The parties' factual submissions include Defendants' Statement of Undisputed Material Facts ("Defendants' SOF") [ECF No. 108]; Plaintiff's Corrected Response to Defendants' Statement of Undisputed Material Facts and Additional Disputed Facts ("Plaintiff's Resp. SOF") [ECF No. 138]; and Defendants' Response to Plaintiff's Additional Material Facts (Defendants' Reply SOF") [ECF No. 140].

(*See* Second Am. Compl. ("SAC") [ECF No. 64] ¶¶ 11–13, 34–35, 42). Plaintiff brings two claims: direct infringement against Karol G and Tiësto ("Count I"); and contributory and vicarious infringement against Atlantic, Kobalt, Sony, and Warner ("Count II"). (*See id.* ¶¶ 60–81).[2]

Plaintiff, a professional flutist and Latin music composer (*see id.* ¶¶ 21–33), has featured AD on several albums and made it available on digital platforms like Spotify and YouTube (*see* Defs.' SOF ¶¶ 18, 20, 22; Pl.'s Resp. SOF ¶¶ 18, 20 (disputed on other grounds), 22 (disputed on other grounds)). As of June 2022, AD had been played 670 times on YouTube and 2,718 times on Spotify, and it was posted to a YouTube channel with roughly 3,700 subscribers. (*See* Defs.' SOF ¶¶ 20–24; Pl.'s Resp. SOF ¶¶ 20–24 (disputed on other grounds)). While Plaintiff also claims to have disseminated AD "through live performances in South Florida, appearances on television programs, compact disc distribution, and online music-sharing platforms since at least 2007[,]" he has not identified corroborating materials beyond the noted digital streaming data. (Pl.'s Resp. SOF 11 ¶ 5 (alteration added); Defs.' Reply SOF ¶ 5 (disputed)).[3] Nor does Plaintiff supply any information about the release, circulation, or commercial success of the four albums on which AD appeared. (*See* Defs.' SOF ¶ 19; Pl.'s Resp. SOF ¶ 19 (disputed on other grounds)).

DBS was created collaboratively over Zoom on May 29, 2020, by writers located in the Netherlands and Finland; Tiësto and others later completed the production, and Karol G added her vocals in the final stages. (*See* Defs.' SOF ¶¶ 27–29; Pl.'s Resp. SOF ¶¶ 27–29 (disputed on other grounds)). The song was first released as a single on August 12, 2021, and subsequently appeared on one of Tiësto's albums. (*See* Defs.' SOF ¶¶ 30–31; Pl.'s Resp. SOF ¶¶ 30–31). Karol G and

---

[2] Counts III and IV — for unjust enrichment and intentional infliction of emotional distress, respectively (*see* SAC ¶¶ 82–94) — were previously dismissed (*see* Feb. 20, 2025 Order [ECF No. 92] 17).

[3] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings. Citations to deposition testimony rely on the pagination and line numbering in the original document.

Tiësto had never heard of AD or Plaintiff before receiving notice of Plaintiff's claims in June 2022. (*See* Defs.' SOF ¶¶ 32–33; Pl.'s Resp. SOF ¶¶ 32–33 (disputed)). As for the other Defendants, Atlantic acknowledges handling marketing, distribution, and royalty payments for DBS; while Kobalt, Sony, and Warner contend their roles were limited to administering publishing rights in the United States. (*See* Defs.' SOF ¶¶ 34–37; Pl.'s Resp. SOF ¶¶ 34–37).

Each side offers a purported music expert to address whether DBS copies protectable elements of AD. Plaintiff relies on Richie Viera, a Latin music producer and former Vice President of Artists and Repertoire ("A&R") at Capitol Records, who contends the two songs share original melodic, harmonic, and rhythmic features. (*See* Defs.' SOF ¶¶ 13, 40–42; Pl.'s Resp. SOF ¶¶ 13, 40–42 (disputed on other grounds); *see also* Defs.' SOF, Ex. A, Viera Am. Report ("Viera Report") [ECF No. 108-1] 93–94, 124). In his Report, Viera determines that there are "undeniable significant similarities" between AD and DBS that "go beyond the boundaries of common influence or casual coincidence." (Viera Report 93). Viera goes so far as to describe DBS as "plagiarism" and "theft," asserting that "distinctive melodic elements, harmonic progressions, and lyrical structures" from AD were "substantially incorporated" into DBS and claiming the infringement has caused Plaintiff reputational and financial harm. (*Id.*).[4]

Defendants respond with an expert report from Dr. Lawrence Ferrara, a musicologist and professor at New York University, who concludes that any similarities arise from unprotectable musical building blocks and that the songs diverge markedly in structure, harmony, and melody.

---

[4] Viera also submitted Rebuttal and Sur-Rebuttal Reports, restating his conclusions, responding to Defendants' expert reports, and offering additional opinions on damages. (*See generally* Defs.' SOF, Ex. C, Viera Rebuttal Report [ECF No. 108-3]; *id.*, Ex. E, Viera Sur-Rebuttal Report [ECF No. 108-5]).

(*See* Defs.' SOF ¶¶ 46–58; Pl.'s Resp. SOF ¶¶ 46–48, 49–58 (disputed); *see also* Defs.' SOF, Ex. B, Ferrara Expert Report [ECF No. 108-2] ¶¶ 84–85).[5]

In their Motions, Defendants seek to exclude Viera's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and request summary judgment on both of Plaintiff's claims. Specifically, Defendants contend that Viera is unqualified and his opinions unreliable; and that even apart from his exclusion, Plaintiff cannot establish copying — by substantial or striking similarity — because the record lacks evidence of access and the works are not meaningfully alike. (*See generally Daubert* Mot.; MSJ).

## II.  LEGAL STANDARDS

***Rule 702 and Daubert.***  The Federal Rules of Evidence govern the admissibility and proper scope of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In forming an opinion, an expert may rely on facts or data made known to him — even if such information is otherwise inadmissible — so long as "experts in the particular field would

---

[5] Defendants also submit a rebuttal report from Barry Massarsky, a music industry economist, who criticizes Viera's damages analysis as methodologically unsound, factually unsupported, and legally flawed. (*See generally* Defs.' SOF, Ex. D, Massarsky Rebuttal Report [ECF No. 108-4]). Specifically, Massarsky contends that Viera misinterprets Recording Industry Association of America ("RIAA") certifications, double counts streaming income, uses global figures in a case limited to U.S. infringement, and fails to apportion revenue for non-infringing elements or third-party payments. (*See id.* ¶¶ 7–33).

reasonably rely on those kinds of facts or data[.]" *Id.* 703 (alteration added). And while an expert may opine on an "ultimate issue" of fact, he may not invade the province of the jury by offering legal conclusions. *Id.* 704; *see also Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("An expert may testify as to his opinion on an ultimate issue of fact . . . [but] may not . . . merely tell the jury what result to reach." (alterations added; citations omitted)).

In *Daubert*, the Supreme Court explained that Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. Courts must perform this "'gatekeeping'" function no matter how scientific, technical, or specialized the evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589 n.7, 597; citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (alteration adopted; emphasis, citation, and quotation marks omitted). Ultimately, the proponent of the expert opinion bears "the burden of establishing qualification, reliability, and helpfulness[.]" *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018) (alteration added; citation and quotation marks omitted).

**Summary Judgment.** If an expert's opinion fails to satisfy the *Daubert* standard, and no other admissible evidence supports a claim, summary judgment may follow. *See, e.g.*, *Chapman v. Procter & Gamble Distr., LLC*, 766 F.3d 1296 (11th Cir. 2014). After all, summary judgment is appropriate when the record — including the pleadings, discovery, and disclosure materials, and any affidavits — reveals no *genuine* dispute of any *material* fact, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). A fact is "material" if it might affect the outcome of the case under the governing law, and a dispute is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). In applying this standard, "the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citation omitted).

Where, as here, the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment either by (1) affirmatively establishing that no genuine dispute exists as to any essential element of the non-moving party's claim or (2) showing that there is an absence of evidence in the record to support that element. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id*. (alteration added; quotation marks omitted; quoting Fed. R. Civ. P. 56(c)(1)).

### III. DISCUSSION

Defendants request that the Court exclude the Viera Report under Rule 702 and *Daubert*, and separately seek summary judgment on Plaintiff's claims. (*See generally Daubert* Mot.; MSJ). The Court begins with the *Daubert* Motion, as its resolution helps clarify — and meaningfully narrow — the issues that remain for summary judgment.

#### A. *Daubert* **Motion**

Defendants challenge the Viera Report on multiple grounds. They argue that Viera is not qualified to conduct a forensic musicological analysis, his methodology lacks rigor and fails to apply recognized principles, and his opinions include legal conclusions and factual assertions unsupported by the record. (*See Daubert* Mot. 1–2, 6–15). Plaintiff insists that Viera's decades of industry experience suffice to qualify him and, regardless, any methodological concerns go to

6

weight, not admissibility. (*See* Resp. 1–5). Defendants have the stronger position.

To situate the *Daubert* inquiry, the Court first identifies the role Viera's opinion is meant to play in Plaintiff's case. In a copyright infringement action, the plaintiff must prove two elements: ownership of a valid copyright and, as relevant here, copying of original elements from the protected work. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Absent evidence of direct copying, the second element is usually established by "demonstrating that the person who composed the [allegedly infringing] work had access to the copyrighted material and that there is substantial similarity between the two works." *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1249 (11th Cir. 1999) (alteration added; citations omitted). "If the plaintiff cannot show access, [he] may still prevail by demonstrating that the works are so strikingly similar as to preclude the possibility of independent creation." *Id.* (alteration added; citation omitted).

Plaintiff makes no attempt to offer proof of direct copying. (*See generally* Resp.). Instead, he maintains that the Viera Report, standing alone, creates a genuine dispute over whether DBS bears both substantial and striking similarity to AD. (*See* MSJ Resp. 8–14).

Against that backdrop, the Court turns to Defendants' *Daubert* challenge. (*See generally Daubert* Mot.). As gatekeeper, the Court must determine whether the Viera Report satisfies the requirements for expert testimony under Rule 702. *See Frazier*, 387 F.3d at 1260 (citation omitted). That inquiry turns on three distinct — although occasionally overlapping — questions: first, whether the expert is qualified to testify competently about the matters he intends to address; second, whether the methodology he employs is sufficiently reliable under the standards set forth in *Daubert*; and third, whether the testimony would help the trier of fact by applying specialized knowledge to the evidence or issues in the case. *See id.* (citations omitted). Defendants challenge Viera on all three grounds, arguing that he lacks the qualifications to opine on forensic musicology, employs no discernible or reliable methodology, and draws conclusions that are not just unhelpful,

7

but risk misleading the jury.  (*See Daubert* Mot. 6–10).

### 1. *Qualifications*

An expert may be qualified "by knowledge, skill, experience, training, or education." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1193 (11th Cir. 2010) (citation omitted). "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260–61.  Indeed, a non-scientific expert such as Viera "may be qualified based on his personal knowledge or experience without the necessity of establishing standards of scientific reliability, such as testability and peer review." *Scott v. Paychex Ins. Agency, Inc.*, No. 22-62052-Civ, 2023 WL 5275182, at *3 (S.D. Fla. Aug. 16, 2023) (citation and quotation marks omitted).

Plaintiff describes Viera as "a distinguished forensic musicologist and music industry consultant with over 45 years of professional experience." (*Daubert* Resp. 3 (emphasis omitted)). In support, Plaintiff states that Viera has participated in 22 legal cases — including three as a testifying expert in copyright actions — and authored three published books used in "academic and legal environments," with a fourth on the way. (*Id.*).  He further notes that Viera has consulted for "prominent musical estates" and "[p]rovided expert forensic reports for high-profile litigation involving Latin and international music catalogs[.]" (*Id.* (alterations added)).

Viera also shows that he is a former Vice President of A&R at Capitol Records, with decades of experience managing and producing Latin artists. (*See* Viera Report 124).  Beyond that, he has taught music business and copyright at the Liceo de Arte y Tecnología in Puerto Rico, led seminars across Latin America, and appeared as a television commentator on music industry issues in Puerto Rico. (*See id.*).  Viera is also a voting member of the Latin Academy of Recording Arts and Sciences and the National Academy of Recording Arts and Sciences. (*See id.*).

Even crediting these assertions, they fall short of establishing that Viera is qualified to conduct the kind of forensic musicological analysis he attempts in this case. While Plaintiff touts Viera's decades in the music industry, experience alone does not open the gate to expert testimony. *See Frazier*, 387 F.3d at 1261 ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." (emphasis in original)). An expert who is "relying solely or primarily on experience . . . must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* at 1261 (alteration added; citation omitted; emphasis in original); *see also Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1322 (11th Cir. 2022) (affirming exclusion of an expert who failed to explain how his experience supported his opinions (citations omitted)). Viera does none of this. (*See generally* Viera Report).[6]

Let's start with his claimed experience as a testifying expert. The list of cases that appears in Viera's CV is long, but not illuminating. (*See* Viera Report 114–17). He cites 22 matters where he allegedly served as an expert, consultant, or musicologist — but nearly all involve the same cluster of parties in the Puerto Rico music industry, with one plaintiff, Joel Bosh, recurring across five suits filed within three years. (*See id.*). Many entries describe Viera simply as a "Music and Entertainment Industry Expert," without indicating whether he was designated as an expert, submitted a report, or offered any testimony accepted under Rule 702. (*See id.*). Viera does not attach any purported expert reports from these cases; nor does Plaintiff clarify which, if any, involved copyright infringement claims analogous to the ones brought here. (*See id.*; *see also*

---

[6] The parties submitted overlapping materials in support of the *Daubert* and summary judgment motions. (*See, e.g.*, Defs.' SOF, Ex. F, Viera Dep. Tr. ("Viera Dep. Tr.") [ECF No. 108-6]; Sammataro Decl. [ECF No. 125], Ex. 5, Viera Dep. Tr. [ECF No. 125-5]). To avoid clutter, the Court cites only the summary judgment filings.

*Daubert* Resp. 3). This list of loosely described prior engagements does not qualify Viera as a forensic musicologist.

Next, we examine Viera's books. Plaintiff highlights Viera's role as an author and educator, pointing to three published books and a forthcoming volume titled *Stolen Music - The Fraud of Prior Art and Musical Building Blocks*. (*See Daubert* Resp. 3). But Plaintiff supplies no academic reviews, peer validation, or usage data to show these works carry weight in the forensic or legal musicology community. (*See id.*). The most specific claim — that one book is used as a reference at Columbia University College in Puerto Rico — is unsupported by any syllabus, course listing, or institutional documentation. (*See id.*). The unpublished book is also unhelpful. Plaintiff contends this text is scheduled for publication in May 2025 (*see id.*) — but with no sign of it as of July 2025, there is nothing for the Court to assess and no reason to treat the work as evidence of Viera's qualifications.

More generally, the nature of Viera's professional background does not qualify him to engage in the comparative analysis his Report purports to offer. While his curriculum vitae ("CV") highlights substantial experience in the business side of the Latin music industry — including artist management, record production, television commentary, and music business education (*see* Viera Report 124) — none of these roles involves the core competencies of forensic musicology: transcribing compositions, analyzing protectable expression, or applying comparative methodologies to determine similarities, *cf. Watt v. Butler*, 744 F. Supp. 2d 1315, 1320 (N.D. Ga. 2010) (declining to exclude expert where ethnomusicologist conducted independent transcription and analysis using established methods, including software tools, and applied consistent methodology from academic and litigation settings), *aff'd*, 457 F. App'x 856 (11th Cir. 2012).

Then there is the question of training. "[M]usicologists . . . are trained in musical analysis and transcription." *Watt*, 744 F. Supp. 2d at 1320 (alterations added). Viera does not hold a degree

10

in musicology, music theory, composition, or any closely related field. (*See* Viera Report 97–98). To be sure, "a proffered expert need not have a Ph.D. to be qualified." *Fair Fight Action, Inc. v. Raffensperger*, No. 18-cv-5391, 2020 WL 13561757, at *7 (N.D. Ga. Nov. 16, 2020). Extensive, field-specific experience may suffice. *See, e.g.*, *Godwin v. CSX Transp., Inc.*, No. 513-cv-134, 2015 WL 4940346, at *3 (S.D. Ga. Aug. 18, 2015). But Plaintiff identifies no history of Viera performing the kind of analytical work — transcribing, comparing, or evaluating compositions — that would qualify him to apply principles of musicology in comparing DBS to AD. (*See Daubert* Resp. 3).

Nor does Viera's deposition testimony bridge the gap. He declined to define standard musicological terms, such as "tonic" and "diatonic" (Viera Dep. Tr. 197:7–25, 203:25–205:23), despite using them in his analysis (*see, e.g.*, Viera Report 29; Viera Rebuttal Report 7). He likewise refused to explain basic harmonic principles like the "circle of fifths" — or explain whether AD changes from a major to a minor key (*see* Viera Dep. Tr. 176:20–177:17, 204:25–205:13) — despite discussing key changes and chord structures in his Report (*see* Viera Report 22, 29). When pressed, Viera admitted "there are many [technical] descriptions that [he] looked for in books" and could no longer recall. (Viera Dep. Tr. 204:25–205:13 (alterations added)).

These lapses only reinforce the conclusion that Viera lacks the expertise to perform the kind of comparative analysis his Report purports to offer. Simply put, the Viera Report lacks the "intellectual rigor" *Daubert* demands. *Carrizosa*, 47 F.4th at 1317.

### 2. Reliability

Even if Viera's experience qualified him to testify, that experience would not render his opinions reliable. Courts evaluating reliability under Rule 702 consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4)

whether the technique is generally accepted in the scientific community." *Griffin v. Coffee Cnty.*, 623 F. Supp. 3d 1365, 1372–73 (S.D. Ga. 2022) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citation omitted). The focus of the reliability analysis is "solely on principles and methodology, not on the conclusions that they generate." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quotation marks and citation omitted).

Defendants explain in detail why Viera's methodology fails every aspect of *Daubert*'s reliability framework. (*See Daubert* Mot. 8–14). His analysis — which relies largely on listening rather than transcription or notation — is neither testable nor replicable, lacks peer review or validation, and departs from accepted musicological methods by failing to conduct a prior art review or isolate protectable elements. (*See id.* 10–13; *see also Daubert* Reply 8–9); *see also Stone v. Carey*, No. 23-cv-09216, 2025 WL 1190518, at *3, *6 (C.D. Cal. Mar. 19, 2025) (noting that courts must distinguish protectable from unprotectable material in copyright cases and that expert testimony, including review and exclusion of prior art, is often essential to that analysis).

That concern is heightened by Viera's admission that he did not prepare the transcriptions in his own Report; Plaintiff supplied them — leaving the foundation of Viera's analysis not just unverifiable, but secondhand. (*See* Viera Dep. Tr. 191:1–21, 196:25–197:5). Compounding the issue, the comparative analysis in Viera's 123-page Report spans just 16 pages (*see* Viera Report 21–37); while most of the document addresses tangential topics like economic rights, moral rights, and damages (*see id.* 38–92) — none of which bears on whether DBS copies protectable elements of AD. Even within those 16 pages, Viera's analysis lacks the rigor expected of forensic musicology: for instance, Dr. Ferrara observes that the Viera Report misidentifies the chords and

12

keys of each song. (*See* Ferrara Report ¶¶ 61–69). Perhaps most critically, the Viera Report fails to consider prior art, a basic step in assessing musical similarity. (*See id.* ¶ 82).

Plaintiff's two-page response is largely unilluminating. (*See Daubert* Resp. 3–5). Plaintiff asserts that Viera's "aural comparisons[,]" supported by "visual representations[,]" are grounded in industry experience and accessible to a jury. (*Id.* 4 (alterations added)). Yet Plaintiff identifies no recognized methodology underlying this framework, nor does he explain how Viera's conclusions can be tested or reviewed. Instead, he urges the Court to reserve these questions for cross-examination. (*See id.* 4–5).

But Viera himself makes no attempt to describe a testable, peer-reviewed method. Asked at his deposition about how he determines originality without evaluating prior art, he replied: "I use my instinct. I use what I have here when I can't smell it. I use my ears. I am able to detect when a word is copied, when there is any sort of copy. I operate at that high level." (Viera Dep. Tr. 75:11–14). He added, "I hold an instinct, something that was granted to me by God. I have a unique perception, something that perhaps very few people in the music industry have." (*Id.* 76:4–6). That is not a methodology; it is, at best, Viera's personal intuition offered up as professional expertise — untestable, unverifiable, and precisely the sort of expert say-so that *Daubert* excludes. *See Frazier*, 387 F.3d at 1261 (citation omitted).

### 3. Helpfulness

Having concluded that Plaintiff has not shown Viera to be qualified or his methodology to be reliable, the Court could end the inquiry here. But for the sake of completeness, it briefly addresses the final *Daubert* factor: that is, whether the testimony would assist the jury. *See Frazier*, 387 F.3d at 1262–63. Expert evidence must "concern[] matters that are beyond the understanding of the average lay person." *Id.* at 1262 (alteration added; citation omitted). Expert

13

testimony will not help the trier of fact, and is inadmissible, "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63 (citation omitted).

The Viera Report does not engage in the type of analysis a jury could not undertake on its own. To the contrary, Viera's assertions rely on intuition and unexplained impressions — the kind of subjective judgments a jury is just as equipped to make as Viera; particularly in the absence of self-generated transcriptions, any review of prior art, or analytical tools to distinguish protectable expression from unprotectable elements. *Cf. Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995) ("Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." (citations omitted)). Because Viera's testimony is not the kind that Rule 702 envisions — evidence that informs, rather than supplants, the jury's judgment — it is properly excluded.

### B. <u>Summary Judgment Motion</u>

As discussed, a plaintiff alleging copyright infringement must either show access and substantial similarity, or — if access is lacking — that the works are strikingly similar. *See Herzog*, 193 F.3d at 1249. With the Viera Report excluded, however, Plaintiff cannot rely on striking similarity: "[W]hen a plaintiff seeks to . . . establish that two works are 'strikingly similar,' [expert] testimony is required." *Testa v. Janssen*, 492 F. Supp. 198, 203 (W.D. Pa. 1980) (alterations added); *see also Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09-23494-Civ, 2011 WL 6202282, at *19 n.27 (S.D. Fla. Dec. 1, 2011) (finding court competent to assess substantial similarity, but not striking similarity or exact copying, without expert testimony (citation omitted)), *aff'd sub nom. Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 F. App'x 873 (11th Cir. 2015).

What remains is the theory of access plus substantial similarity. Courts are competent to determine substantial similarity as a matter of law and without expert testimony. *See Olem Shoe*

*Corp.*, 2011 WL 6202282, at *19 n.27 (citation omitted). But that inquiry becomes relevant only if Plaintiff presents evidence from which a reasonable jury could infer Defendants had a reasonable opportunity to hear AD. *See Herzog*, 193 F.3d at 1249. The Eleventh Circuit has stressed that "access may not be inferred through mere speculation or conjecture" or from general dissemination "in places or settings where [a] defendant may have come across it." *Morford v. Cattelan*, No. 23-12263, 2024 WL 3857453, at *2 (11th Cir. Aug. 16, 2024) (first alteration adopted; second alteration added; citation and quotation marks omitted). Rather, a plaintiff must show a nexus between a defendant and the work; and a work's passive availability online — even across multiple platforms — is insufficient to create such a nexus. *See id.*

Passive availability is all Plaintiff shows. The record reveals little more than AD's presence in the digital ether, one among millions of songs. Plaintiff points to the work's inclusion on four albums, modest online streaming figures, and general availability on digital platforms like YouTube and Spotify; but he offers no evidence that AD circulated widely within the Latin music industry — no substantial streaming numbers, playlist features, industry attention, radio play, or chart placement, or any promotional campaign aimed at a broader audience. (*See* MSJ Resp. 6–8; Defs.' SOF ¶¶ 20–24; Pl.'s Resp. SOF ¶¶ 20–24 (disputed on other grounds)). Nor does Plaintiff show that the song was performed in venues frequented by Defendants or distributed directly to Defendants. (*See* Defs.' SOF ¶¶ 32–33; Pl.'s Resp. SOF ¶¶ 32–33 (disputed)); *cf. Benson v. Coca-Cola Co.*, 795 F.2d 973, 975 (11th Cir. 1986) (affirming directed verdict for defendant where plaintiff had performed his song in various states and mailed it to record labels but offered no evidence that defendants' songwriters attended those performances or ever received the song).

Rather than identifying a plausible path by which AD reached Defendants, Plaintiff invites the Court to infer access from the mere fact that the song existed online and was available to the

world.[7] This is precisely the kind of "conjectural and speculative" access theory that fails at summary judgment. *Watt v. Butler*, 457 F. App'x 856, 860 (11th Cir. 2012). Like the plaintiff in *Watt*, who relied on street-level distribution and regional performances to contend Atlanta-based defendants must have encountered his track — an argument the Eleventh Circuit found too speculative, *see id.* at 859–60 — Plaintiff points only to AD's presence on digital platforms and inclusion in niche albums as proof that Tiësto and Karol G heard his song (*see* MSJ Resp. 6–8). No reasonable jury could find access on such a record. *Cf. Morford*, 2024 WL 3857453, at *2 (affirming summary judgment for a defendant where plaintiff failed to show a "reasonable opportunity" for the defendant to view his artwork; although the work was posted on social media and blogs for nearly a decade and allegedly viewed by thousands of individuals across 25 countries, its online presence did not establish a nexus or render access more than conjectural).

Because Plaintiff has not raised a genuine dispute of material fact as to access, the Court does not reach the question of substantial similarity. And without a viable claim for direct infringement, Plaintiff's vicarious and contributory infringement claims fail as a matter of law. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (citation omitted). Summary judgment is thus warranted on all remaining claims.

### IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment **[ECF No. 107]** and Motion to Exclude Plaintiff's Proposed Expert **[ECF No. 110]** are **GRANTED**. The Clerk is directed to **CLOSE** this case. Final judgment shall issue by separate order. Any other

---

[7] Plaintiff emphasizes that Defendants' expert, Dr. Ferrara, located AD online while preparing his rebuttal report. (*See* MSJ Resp. 7). But that does not support access. Dr. Ferrara was searching for the song in response to this lawsuit — not encountering it organically in the course of his work or life.

pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Miami, Florida, this 9th day of July, 2025.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record